84 N.Y.2d 685 (1995)
645 N.E.2d 1195
621 N.Y.S.2d 497
Bocre Leasing Corporation, Plaintiff,
v.
General Motors Corporation (Allison Gas Turbine Division), Defendant.
Court of Appeals of the State of New York.
Argued October 18, 1994.
Decided January 10, 1995.
Gilman, Pangia & Balsamo (Michael J. Pangia and Barry C. Hansen, of the District of Columbia Bar, admitted pro hac vice, of counsel) and Joseph W. Ryan, Jr., Uniondale, for plaintiff.
Katten Muchin & Zavis, New York City (John N. Romans of counsel), for defendant.
Chief Judge KAYE and Judges TITONE, SMITH, LEVINE and CIPARICK concur with Judge BELLACOSA; Judge SIMONS dissents in part in a separate opinion.
*687 BELLACOSA, J.
Plaintiff, a four-times-removed-downstream purchaser of a helicopter, may not recover from the original engine manufacturer under either strict products liability or negligence theories. Judge Wexler correctly applied governing New York law in dismissing the diversity action brought by plaintiff in the United States District Court for the Eastern District of New York. We conclude that the reasoning of East Riv. S. S. Corp. v Transamerica Delaval (476 US 858) persuasively explains and points to the resolution of the policy determination underlying this dispute and point of law. Plaintiff thus has no cause of action in tort against the remote manufacturer for contractually based economic losses, including to the product itself, occasioned by the failure of the product which was the subject of plaintiff's arm's length, negotiated purchase from a subsequent owner.

I.
Defendant, in 1972, manufactured a jet engine and sold it to Bell Helicopter, Inc., which installed the engine in one of its helicopters. Several months later, Petroleum Helicopters Inc. acquired the helicopter and operated the aircraft for over 12,000 hours. After 14 years of ownership, in mid-1986, Petroleum Helicopters sold the helicopter to Edwards & Associates, a brokerage firm dealing in used aircraft. Plaintiff purchased the helicopter late in 1986 from Edwards & Associates.
Plaintiff and the seller, Edwards & Associates, negotiated the terms of their purchase agreement. The particularity of their transaction is evinced by several amendments made to the standard language of their agreement, which include provisions for: (1) risk of loss, under which the risk would be shifted to the purchaser after purchaser's acceptance of the aircraft; (2) warranties of title and against encumbrances; and (3) a condition precedent to purchaser's acceptance of the aircraft  namely, a satisfactory "test flight, functional test of all equipment, [and] a mechanical inspection." Additionally, the purchase agreement stated that plaintiff expressly agreed to accept the 14-year-old helicopter in "AS IS" condition, for a price of $214,000. Plaintiff insured the aircraft for $275,000.
Later, plaintiff, which was engaged in the aircraft leasing business, leased the subject helicopter to a number of entities. *688 In May 1989 (almost three years after plaintiff's purchase and 17 years after the manufacture of the engine), the helicopter experienced a power loss, allegedly due to a failed engine compressor blade. Despite the loss of power and the resulting "auto rotation," the helicopter landed safely, sustaining only minor property damage to the helicopter itself, with no damage whatsoever to persons or other property.
To move the helicopter from the initial "accident" site to its hanger in Farmingdale, the aircraft was loaded by a truck driver onto a truck. En route to Farmingdale, the truck with helicopter atop struck a highway overpass. The helicopter sustained significant damage. Although the driver attempted to correct the loading problems, the efforts proved unsuccessful, and the helicopter smashed into a second overpass, resulting in more property damage to the helicopter.
Subsequent to these incidents, plaintiff received a total of $371,600  $275,000 from its insurer and $96,600 from the insurer of the truck. Plaintiff, either directly or for subrogation purposes, seeks recovery in tort against the manufacturer in the amount of $450,000 for losses, including the cost of repairs and lost profits.
The sound reasoning provided by the United States Supreme Court in East Riv. supports the bright line rule as compelling in this case, too (see, 476 US 858, 870-875, supra). Both generally and specifically under the facts of this case, cogent policy considerations militate against allowing tort recovery for contractually based economic losses in this kind of commercial dispute (id.).

II.
A purchaser enjoys the contractual control and choice to protect itself with insurance and UCC warranties (see, 10A Couch, Insurance 2d §§ 42:385-42:401, 42:414-42:417, at 496-508, 520-524 [rev ed 1982]; East Riv. S. S. Corp. v Transamerica Delaval, 476 US 858, 872-873, supra). The particular seller and purchaser are in the best position to allocate risk at the time of their sale and purchase, and this risk allocation is usually manifested in the selling price (id., at 873). Allowing the purchaser to recover in tort for what is, in sum and substance, a commercial contract claim, as is the case here, would grant the purchaser more than the "benefit of [the] bargain" to which the purchaser agreed (see, id., at 873 [stating that "expectation damages available in warranty for *689 purely economic loss give a plaintiff the full benefit of its bargain by compensating for foregone business opportunities"]; see also, Rocky Mtn. Helicopter v Bell Helicopter Textron, 24 F.3d 125, 129, 130 [10th Cir] [applying Texas law]). This serves no cognizable tort public policy purpose (see, Scandinavian Airlines Sys. v United Aircraft Corp., 601 F.2d 425, 429).
Having foregone protecting itself with UCC warranties, plaintiff should not be permitted to "fall back on tort when it has failed to preserve its * * * remedies" (Rocky Mtn. Helicopter v Bell Helicopter Textron, 24 F.3d 125, 130, supra; see also, East Riv. S. S. Corp. v Transamerica Delaval, 476 US 858, 871-872, 874, supra [stating that "(d)amage to a product itself is most naturally understood as a warranty claim" and that "both the nature of (such an) injury and the resulting damages indicate it is more natural to think of injury to a product itself in terms of warranty"; also stating that injury to a product itself is a loss that can be insured]).
In purchasing a 14-year-old helicopter, plaintiff could have negotiated a UCC-seller's warranty (see, id., at 872-873). Instead, plaintiff chose to purchase the helicopter in "AS IS" condition. Plaintiff eschewed the very protections which are specifically designed to shelter a purchaser from the particular type of losses at issue in this Federal diversity lawsuit (see, generally, 1 White and Summers, Uniform Commercial Code, at 501-526 [Practitioner's 3d ed 1988] [suggesting that UCC warranties are designed to protect buyer from the cost of a bad bargain and to provide the buyer with the value of the goods as warranted]). Undoubtedly, the lack of a seller's or manufacturer's warranty was reflected in the purchase price (see, East Riv. S. S. Corp. v Transamerica Delaval, 476 US 858, 873, supra). Notably, plaintiff insured the helicopter in the amount of $275,000, $61,000 greater than the purchase price, further suggesting that plaintiff's failure to demand a seller's warranty was proportionately reflected in the selling price.
Because the allocation of risk was fixed by the parties at the time of purchase, plaintiff should be deemed to have assumed that risk of loss. Courts should not later modify plaintiff's commercial contractual risks by interposing a belated tort benefit or potentiality (see, Hininger v Case Corp., 23 F.3d 124, 127 [stating that, in a commercial context, the purchaser should not be allowed "`to reach back up the production and *690 distribution chain, thereby disrupting the risk allocations that have been worked out in the transactions comprising that chain'"]).
Public policy considerations do not mandate a different result and realistically and cogently support the view we propound. Holding manufacturers of dangerous products liable in tort to downstream purchasers who are personally injured by those products is precedentially sound and unassailable. MacPherson v Buick Motor Co. (217 N.Y. 382) marks a jurisprudential breakthrough and common-law development at its best, by extending a manufacturer's duty of care beyond immediate purchasers. The instant case, however, does not qualify for such treatment, because to recognize tort responsibility in these circumstances would create more problems than it would solve.
Public policy objectives reflected in tort principles are not advanced by allowing downstream purchasers recovery in a case such as this (see, East Riv. S. S. Corp. v Transamerica Delaval, 476 US 858, 871, supra). The approach urged by plaintiff would unjustifiably crisscross the appropriately discrete lines of tort and contract by allowing a strict products liability claim for all contractually based economic losses in settings involving only unduly dangerous products. Asserting public policy, the partial dissent would allow tort recovery in this case, but only for those damages to the property itself and not for the consequential economic losses. Under either approach, the tendered justification is simply a generalized hope that permitting tort recovery would serve as an incentive for manufacturers to use the safest possible practices. In East Riv., the United States Supreme Court refutes that idealized expectation:
"When a product injures only itself the reasons for imposing a tort duty are weak and those for leaving the party to its contractual remedies are strong.
"The tort concern with safety is reduced when an injury is only to the product itself. When a person is injured, the `cost of an injury and the loss of time or health may be an overwhelming misfortune,' and one the person is not prepared to meet. Escola v. Coca Cola Bottling Co., 24 Cal. 2d, at 462, 150 P. 2d, at 441 (opinion concurring in judgment). In contrast, when a product injures itself, the *691 commercial user stands to lose the value of the product, risks the displeasure of its customers * * *, or, * * * experiences increased costs in performing a service. Losses like these can be insured." (East Riv. S. S. Corp. v Transamerica Delaval, 476 US 858, 871-872, supra.)
Contrary to the urgings of the partial dissent, damages relating to the safety of persons and property are simply not in issue in this case. These consumer safety concerns are accounted for by holding manufacturers ultimately liable, as  New York law amply does  for those kinds of personal or property injuries and losses which are outside the scope of the contractually based economic losses, attendant to the particular commercial transaction and subject matter (see, Scandinavian Airlines Sys. v United Aircraft Corp., 601 F.2d 425, 429, supra). Since any product put into the stream of commerce has the theoretical potential to injure persons and property, the incentive to provide safe products is always present (id.). Plaintiff and the partial dissent would answer the Second Circuit Court of Appeals' certified question essentially in the affirmative, on the theory that some heightened safety incentive or exhortation, underpinned by broadened tort responsibility imposed by the courts into commercial transactions, will buttress the social policy. Particularly in light of the comparatively astronomic liability associated with personal injury, as contrasted to contractually based economic losses, which are at issue here  whether resulting from injury to the contracted-for property or the consequential losses flowing from that injury  the generalized safety incentive rationale propping up the affirmative response result dissolves.
Allowing plaintiffs recovery in tort for losses of the type at issue here, but only in cases where an allegedly "unduly hazardous" product is the source of the commercial contract and dispute, interjects uncertainty in law and commercial transactions risk allocation by bifurcating the legal universes (East Riv. S. S. Corp. v Transamerica Delaval, 476 US 858, 870, supra). Such an approach would contradict in a sense the certified question procedure, which is designed and employed to provide certainty to and settlement of State law issues (Court of Appeals Rules of Practice [22 NYCRR] § 500.17; see, Banque Worms v Bankamerica Intl., 928 F.2d 538, 540-541). A special niche would be unduly carved for such purchasers, allowing them to forego traditional commercial protections and instead to rely on inappropriate, noncommensurate tort *692 lawsuits down the transactional road. For "inherently dangerous" products, purchasers would be granted an incentive to roll the dice, hope nothing happens, and initially reap the financial benefits of a low purchase price or low (or no) insurance premiums. If something untoward were to happen to the product itself, however far down the road, ultimate purchasers of unduly hazardous products could still reach all the way back through however-many intervening transactions to sue the original manufacturers in tort. This boomerang effect is not prudent common-law development and policy.
Additionally, the affirmative response to the certified question would create an anomaly which would disserve the public interest. A natural, undesirable result would be that manufacturers would find it difficult "to take into account the expectations of persons downstream who may encounter [their] product[s]" (East Riv. S. S. Corp. v Transamerica Delaval, 476 US 858, 874, supra). The case at hand, with the double overpass crashes, is a dramatic illustration. Here, the manufacturer would be held liable to (1) a plaintiff who is a four-times-removed purchaser, for (2) damages with respect to a product that is 17 years old, and (3) for damages virtually entirely contractual in nature and really attributable to other parties. Such a rule would transform manufacturers into insurers, only under New York law, with unlimited tort liability, which they could neither reasonably predict nor properly insure against (id., at 874; contra, Emerson G.M. Diesel v Alaskan Enter., 732 F.2d 1468, 1474, and n 8 [9th Cir]).
The consuming public ultimately suffers when manufacturers are prevented from properly managing and reliably predicting the consequences of their business transactions. In essence, all consumers would subsidize or "pay premiums" for purchasers of assertedly "unduly dangerous" products (see, Casa Clara Condominium Assn. v Toppino & Sons, 620 So 2d 1244, 1247 [Fla] [questioning whether, in cases where only economic losses are involved, the "`consuming public as a whole should bear the cost of economic losses sustained by those who failed to bargain for adequate contract remedies'"]). The public at large would receive no real benefit, since tort liability (personal injury and other property damage) is already generally present (see, Scandinavian Airlines Sys. v United Aircraft Corp., 601 F.2d 425, 429, supra). That long-standing liability exposure reasonably serves as a more than adequate social policy disincentive against manufacturers *693 floating unsafe products into the stream of commerce (id.).
Additionally and contrary to the partial dissent's view, we can discern no compelling rationale to distinguish between different types of typical contractually related losses and devise disparate rules of recovery. Property damage to the helicopter itself and lost profits (lost rentals and air time) are classic contractual-type economic damages, and plaintiff could have protected itself from both types of losses via UCC warranties and insurance. Thus, the rationale that would preclude recovery for one should also preclude recovery for the other. Moreover, if the partial dissent's deterrence rationale is to be accepted, then, again, there is no basis to distinguish between these types of economic losses and have a different recovery rule for each. Under the dissent's rationale, the higher the potential for liability, the greater will be the deterrence effect; thus, that deterrence rationale supports treating the two types of contractual economic harms identically for purposes of the certified question. Consequently, we reject creating a bifurcated rule of recovery within the contractual loss universe. Given the reality of already existing, ample deterrents to manufacturers injecting unsafe products into the commerce stream, and the resultant lack of a substantive public policy purpose to be furthered by imposing additional tort liability in these circumstances, no tort recovery can be had against the manufacturer for contractually based economic loss, whether due to injury to the product itself or consequential losses flowing therefrom.
Finally, our previous rulings in Schiavone Constr. Co. v Elgood Mayo Corp. (56 N.Y.2d 667, revg 81 AD2d 221 [adopting dissent]) and Bellevue S. Assocs. v HRH Constr. Corp. (78 N.Y.2d 282) do not counterindicate the adoption here of the East Riv. approach. Because of the claims at issue, which did not involve unduly hazardous products, we found it "unnecessary to accept or reject [the] invitation to adopt East River as a matter of State law" (Bellevue S. Assocs. v HRH Constr. Corp., 78 N.Y.2d 282, 293, supra). We expressly reserved there the question we squarely face here, as a result of our accepting the certification request from the Second Circuit Court of Appeals.

III.
In sum, New York should join the majority of jurisdictions that have recognized the cogency of the East Riv. analysis and *694 approach, at least in situations such as are presented here. New York would thus be in the mainstream, where it belongs in such matters, with respect to the regulation and resolution of controversies of this kind (see, e.g., Rocky Mtn. Helicopters v Bell Helicopter Textron, 24 F.3d 125, 130, and n 2 [10th Cir], supra; Hininger v Case Corp., 23 F.3d 124, 126-127 [5th Cir] [applying Texas law], reh denied 32 F.3d 568, supra; Winchester v Lester's of Minn., 983 F.2d 992, 996 [10th Cir] [applying Kansas law]; Miller's Bottled Gas v Borg-Warner Corp., 955 F.2d 1043, 1049-1050 [6th Cir] [applying Kentucky law]; Casa Clara Condominium Assn. v Toppino & Sons, 620 So 2d 1244, 1246, and n 2, 1247-1248 [Fla], supra; Aloe Coal Co. v Clark Equip. Co., 816 F.2d 110, 117).
Tort recovery in strict products liability and negligence against a manufacturer should not be available to a downstream purchaser where the claimed losses flow from damage to the property that is the subject of the contract. Transforming manufacturers into insurers, with the empty promise that they can guarantee perpetual and total public safety, by making them liable in tort for all commercial setbacks and adversities is not prudent or sound tort public policy. In such instances, no directly related or commensurate public interest is served or protected by holding manufacturers liable. Tort law should not be bent so far out of its traditional progressive path and discipline by allowing tort lawsuits where the claims at issue are, fundamentally and in all relevant respects, essentially contractual, product-failure controversies. Tort law is not the answer for this kind of loss of commercial bargain.
Accordingly, the certified question should be answered in the negative.
SIMONS, J. (concurring in part and dissenting in part).
The majority hold that the plaintiff has no remedy in this action because the damages are only "economic" and in that circumstance the risk of loss is best allocated between the parties by contract. In fact, there are two types of damages sought here: property damages for injury to the helicopter itself and the consequential loss of income and incidental expenses resulting from the destruction of the helicopter. I would allow a tort recovery for the former but not the latter.
As we have recognized, the fundamental distinction between tort and contract arises from "`the nature of the interests protected. Tort actions are created to protect the interest in *695 freedom from various kinds of harm. The duties of conduct which give rise to them are imposed by the law, and are based primarily upon social policy, and not necessarily upon the will or intention of the parties'" (Victorson v Bock Laundry Mach. Co., 37 N.Y.2d 395, 401 [quoting, Prosser, Torts § 92, at 613 (4th ed)]). The majority, focusing exclusively upon plaintiff's apparent choice not to protect itself by contract provisions, repudiates any consideration of the duty of the manufacturer. It would agree with the Supreme Court that in commercial settings the manufacturer's ability "easily to structure their business behavior" is the paramount concern (East Riv. S. S. Corp. v Transamerica Delaval, 476 US 858, 870). But this Court in a long line of decisions has resolved the question of public policy in favor of imposing a tort duty of care on manufacturers to protect consumers from dangerous and defective products (see, e.g., Thomas v Winchester, 6 N.Y. 397; Devlin v Smith, 89 N.Y. 470; MacPherson v Buick Motor Co., 217 N.Y. 382; Codling v Paglia, 32 N.Y.2d 330; Micallef v Miehle Co., 39 N.Y.2d 376). Our law holds that if a manufacturer distributes a product which is unreasonably dangerous, one injured as a result of using the product may maintain an action in strict products liability. The duty of care is properly placed on the manufacturer, we have said, because in today's society the manufacturer is in the best position to recognize and cure defects in its product which may cause injury and because it is in the best position to spread the cost for its failure to remedy such risks (see, Codling v Paglia, 32 N.Y.2d 330, 341, supra).
Thus, a legal duty was imposed on defendant to avoid distributing a dangerously defective product at the time the product left its hands. If defendant breached that duty and plaintiff's pilot was subsequently injured or the property of others damaged, defendant would be answerable in tort under accepted law. There is no good reason why tort recovery should not be similarly permitted when the defective product injures only itself. The damage to the helicopter is a direct and foreseeable harm proximately caused by the manufacturer's breach of duty to market a product that was not dangerously defective and the manufacturer should not be cloaked with immunity merely because the resultant damage was fortuitously limited to the helicopter itself (see, Dudley Constr. v Drott Mfg. Co., 66 AD2d 368 [Hancock, Jr., J.]; Krzys v American Honda Motor Co., 124 AD2d 947, 948; Trustees of Columbia Univ. v Mitchell/Giurgola Assocs., 109 AD2d 449, 455; *696 see also, Star Furniture Co. v Pulaski Furniture Co., 171 W Va 79, 297 SE2d 854; Russell v Ford Motor Co., 281 Ore 587, 575 P2d 1383; Cloud v Kit Mfg. Co., 563 P2d 248 [Alaska]; Vulcan Materials Co. v Driltech, Inc., 251 Ga 383, 306 SE2d 253). Whatever property is injured by the accident, the damage resulted from the same tortious conduct by the manufacturer in supplying a product that was dangerous. The well-developed considerations of public policy favoring recovery in the case of damage to property other than the product are no more compelling than those favoring recovery of resultant damages to the helicopter itself. One purpose of strict liability in tort is "to prevent a manufacturer from defining the scope of his responsibility for harm caused by his products" (Seely v White Motor Co., 63 Cal 2d 9, 17, 403 P2d 145, 150), and to reassign the risk of defective manufacture to the consumer for some property damages but not others undermines settled New York policy supporting the law of products liability.
I agree with the majority, however, that consequential damages for lost profits and incidental expenses suffered by plaintiff are not recoverable in tort. The distinction between property damage and economic injuries resulting from property damage is not arbitrary but recognizes the conceptual differences in tort and contract remedies and the various risks and obligations undertaken between a manufacturer and a consumer. Lost profits and other similar damages, unlike property damage, are properly cognizable as contract or warranty damages for which the consumer can bargain. The manufacturer should not be subjected to liability for the unlimited, unpredictable, and unforeseeable economic damages that may occur as a result of the particular use of the product by an attenuated commercial consumer (see, East Riv., 476 US, at 874, supra). On the other hand, the manufacturer may be held liable for the foreseeable damage to property resulting from a dangerous defect in the product. Former Chief Justice Traynor explained the distinction in this way:
"[the manufacturer] can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm. He cannot be held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands. A *697 consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will" (Seely v White Motor Co., 63 Cal 2d 9, 18, 403 P2d 145, 151, supra).
Finally, the majority's decision appears to be driven by a number of irrelevant concerns. First, it observes that the consumer is fully capable of insuring against the loss. Presumably, all plaintiffs can insure against loss, whether resulting from injury to person or property, but that has no bearing on tort remedies and to hold that it does eviscerates tort law. Nor is it significant that this is a subrogation claim. Second, neither the passage of time, the relationship of the parties or the subsequent, additional damage to the helicopter effect the existence of the manufacturer's duty and plaintiff's right to recover for the property damage caused by the breach of that duty. After reading the majority opinion, however, one might wonder if the result would be different if plaintiff had purchased the helicopter directly from defendant shortly after its manufacture and a few days before the accident. Finally, the fact that plaintiff purchased the helicopter in "as is" condition does not alter the duty imposed on the manufacturer. That provision may limit the scope of the manufacturer's or seller's warranties, but it cannot diminish the manufacturer's duty to refrain from injecting dangerously defective products into the stream of commerce.
Accordingly, I would hold that plaintiff may recover in tort for damages to the helicopter itself.
Following certification of a question by the United States Court of Appeals for the Second Circuit and acceptance of the question by this Court pursuant to section 500.17 of the Rules of the Court of Appeals (22 NYCRR 500.17), and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, certified question answered in the negative.