DEPARTMENT OF WATER AND POWER OF the CITY OF LOS ANGELES, Southern California Edison Company, the City of Pasadena the City of Glendale and the City of Burbank, Plaintiffs,

v.

ABB POWER T & D COMPANY, Defendant.

No. CV 94–3070–SVW(BQRx).

United States District Court, C.D. California.

Sept. 8, 1995.

Henry J. Bogust, William C. Falkenhainer, Clay Robbins III, Chase, Rotchford, Drukker & Bogust, Los Angeles, CA, for plaintiffs.

Kathyleen A. O'Brien, Harold E. Hamersmith, Sheppard, Mullin, Richter & Hampton, Los Angeles, CA, Philip Le B. Douglas, Frederick A. Brodie, Edward Flanders, Takemi Ueno, Winthrop, Stimson, Putnam & Roberts, New York City, NY, for defendant.

## MEMORANDUM OPINION AND ORDER

WILSON, District Judge.

### I. Background

The Columbia River in Oregon provides an abundance of low-cost, clean hydroelectric energy. In 1970, in order to capitalize on seasonal variations in power supply and demand between the Pacific Northwest and Southern California, the second largest high-voltage direct current ("HVDC") power transmission station in the world was commissioned. Called the Pacific High Voltage Direct Current Intertie ("Intertie"), it transmits electric power between Columbia River hydroelectric plants and Southern California.

During summer months, heavy Columbia River flow provides energy to meet Southern California's need for electricity to run air conditioners. In the winter, power can be transmitted from Southern California to the Pacific Northwest to make up for diminished flow.

The power is transmitted by direct current ("DC") between converter stations in Celilo, Oregon and Sylmar, California. For technical reasons, it is more efficient to send power by a DC line. When it arrives, it must be converted to alternating current ("AC") for use by consumers.

Plaintiff Department of Water and Power of the City of Los Angeles ("DWP") is the manager/operator of the southern portion of the Intertie, including the Intertie's first Los Angeles converter terminal, Sylmar Converter Station ("Sylmar–West"). Plaintiff Southern California Edison Company ("Edison") owns 50 percent of the southern portion of the Intertie, DWP owns 40 percent, and plaintiff cities of Pasadena, Glendale and Burbank share the remaining 10 percent.

DWP[1] and defendant ABB Power T & D Company ("ABB") executed a contract (the "Contract") on December 19, 1985.[2] The purpose of the Contract was to procure HVDC equipment for the Sylmar Converter Station East ("Sylmar–East"), an expansion of the original Sylmar–West.

Modern long distance HVDC systems are at the cutting edge of electrical engineering technology. The equipment must alter fundamental characteristics of great quantities of high-voltage electrical energy. Long distance HVDC facilities did not come into commercial use until the late 1960's.

The HVDC equipment purchased in the Contract converts high-voltage AC to DC and vice-versa. A long distance HVDC system includes a transmission line, and, at each end, high-voltage converter equipment and switchyards. The converter equipment at one end of the transmission line converts AC to DC for transmission to the other end, where it is converted from DC back to AC for wholesale distribution over a high-voltage regional grid. HVDC systems can move electrical power in either direction, depending on where the excess supply and demand are. The collection of equipment for converting electricity between AC and DC is usually referred to as a "converter terminal."

Among the numerous items of equipment used in HVDC conversion are assemblies called "valves." Valves are located inside a "valve hall" in a terminal building. The first generation of HVDC systems, developed in the 1960's, used "mercury arc" valves, which essentially are huge vacuum tubes. In the 1970's, as a result of advances in solid-state technology, smaller and more efficient "thyristor" (i.e. semi-conductor) valves were developed and were offered by suppliers.

1. In entering into the contract, DWP was acting as agent for the other plaintiffs. Reply ¶ 3. The Court will refer to both DWP and the other plaintiffs interchangeably as either "DWP" or "plaintiffs."

2. The contract was actually executed by DWP and ABB's predecessor, BBC Brown Boveri, Inc ("BBC"). ABB is an indirect subsidiary of ABB Asea Brown Boveri Ltd. ("ABB Ltd."), a Swiss-based holding company for entities that manufacture heavy industrial and electrical equip-ment, among other things. ABB Ltd. is the result of a 1987 combination of two groups—a Swedish company, ASEA AB, and a Swiss entity, BBC Brown Boveri Ltd. In 1988, ASEA AB and Brown Boveri Ltd.'s United States high-voltage, direct-current operations were consolidated into ABB. ABB is the same legal entity as BBC, with a name change. For simplicity sake, the Court will refer to all of these entities as ABB throughout this opinion.

The Contract was the product of 20 months of arm's length communications and negotiations between the parties, in which a great number of technical and commercial issues were considered and resolved. Tender of delivery for Sylmar–East was made and the HVDC equipment was installed by July 1988.

On October 30, 1993, a fire started, apparently in one of the thyristor valves. DWP's fire investigation expert contends that the fire began with the failure of the power supply circuitry of a thyristor electronic card ("TE Card") that allowed some electronic components on the TE Card to be exposed to voltage stress greater than its capabilities, resulting in its failure. DWP believes that the fire occurred because of a defect in the design of the TE Card both with respect to the circuitry and the materials used to construct the TE Card, the TE Card connectors, and a water shield.

The fire spread to the other two thyristor valves. The three massive valves, which weigh over 100,000 pounds each, and which had been suspended from the ceiling, fell to the floor when heat from the fire melted the grout that connected the valves to the ceiling. As plaintiffs put it, they suffered a total, catastrophic loss of property.

Plaintiffs filed a complaint alleging ten causes of action: breach of contract, breach of express warranty, breach of implied warranty, strict liability, negligence, breach of implied covenant of good faith and fair dealing, negligent misrepresentation, fraud, unfair business practices and declaratory relief.

Defendants have filed multiple motions for summary judgment. This Memorandum Opinion and Order deals only with the tort issues. Discovery did not proceed prior to the filing of the summary judgment motions because the Court concluded that taking discovery would not have been helpful to the resolution of these issues.

## II. Standard of Review

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court must grant a Motion for Summary Judgment unless the opposing party produces evidence from which a "fair minded jury could return a verdict" in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252–55, 106 S.Ct. 2505, 2512–13, 91 L.Ed.2d 202 (1986). Inferences are to be drawn in favor of the non-moving party. *Baxter v. MCA, Inc.*, 812 F.2d 421 (9th Cir.), *cert. denied*, 484 U.S. 954, 108 S.Ct. 346, 98 L.Ed.2d 372 (1987).

ABB is entitled to summary judgment if plaintiffs "fail[ ] to make a sufficient showing on an essential element of [their] case with respect to which [they have] the burden of proof." *Celotex Corp v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A party opposing summary judgment "may not rest on conclusory allegations, but must set forth specific facts showing that there is a genuine issue for trial." *Leer v. Murphy*, 844 F.2d 628, 631 (9th Cir.1988).

## III. Tort Claims

### A. Products Liability

#### 1. Kaiser Criteria

Strict liability was created to aid injured consumers "who are powerless to protect themselves." *Greenman v. Yuba Power Prods., Inc.*, 59 Cal.2d 57, 63, 27 Cal. Rptr. 697, 701, 377 P.2d 897, 901 (1963). The doctrine does not apply, however, where sophisticated parties have the ability to allocate risks and avail themselves of their rights and remedies under commercial law. To permit contract claims to masquerade as product liability torts frustrates both the parties' own bargained allocations of risk and the legislature's purposes in enacting contract legislation such as the Uniform Commercial Code ("UCC"). In California, courts "must not, in deference to the Legislature, create rules of liability which displace those of the Uniform Commercial Code." *Kaiser Steel Corp. v. Westinghouse Elec. Corp.*, 55 Cal.App.3d 737, 747, 127 Cal.Rptr. 838, 845 (1976).

*Kaiser* and its progeny foreclose strict liability "as between parties who (1) deal in a commercial setting; (2) from positions of relatively equal economic strength;

(3) bargain the specifications of the product; and (4) negotiate concerning the risk of loss from defects in [the product]." 55 Cal. App.3d at 748, 127 Cal.Rptr. at 846. *See also Scandinavian Airlines Sys. v. United Aircraft Corp.*, 601 F.2d 425, 429 (9th Cir.1979). As discussed below, consistent with the policies of strict products liability, at least one California court and the Ninth Circuit have held that, rather than actual bargaining, the third and fourth *Kaiser* factors require only the existence of bargaining power.

■ All four *Kaiser* factors are met in this case. First, the Court finds, and DWP does not dispute that, DWP and ABB dealt in a commercial setting. For example, the Contract speaks expressly of Sylmar–East's "Commercial Operation" and refers to DWP operating Sylmar–East "commercially." Subart. E1–28.1.

Second, the parties dealt from positions of relatively equal economic strength. In fact, it is beyond dispute that plaintiffs were dealing from a position of superior economic strength. The plaintiffs participated as co-purchasers in a joint procurement with the United States Government, acting through the Bonneville Power Authority, in which all purchasers together selected the same supplier. Weinrich Aff. ¶ 39. Together, with combined annual sales over $6 billion, plaintiffs can only be described as extremely economically powerful. *Id.;* Ex. E at 1–2; Ex. F. The bidders for the project, on the other hand, dealt from a position of overcapacity, weak markets and intense competition. Weinrich Aff. ¶ 33–35, 37, 38.

DWP argues that it was not dealing from a position of relatively equal technical strength. Even if true, the Court questions whether this would be relevant. Nevertheless, DWP's claim is belied by the undisputed evidence. While ABB might have been an expert at designing and manufacturing HVDC equipment, DWP had been involved for the past 20 years in at least the construction and/or operation of the two largest HVDC projects ever built. It is not as if DWP had no experience with HVDC technology. Thus, the Court concludes that the parties were dealing from a position of *relatively* equal technical strength.

Based on the undisputed evidence, the Court concludes that the parties were dealing from relatively equal positions. Thus, the second *Kaiser* factor has been satisfied.

The third *Kaiser* factor is whether the parties bargained the specifications of the project. DWP argues that the third *Kaiser* factor has not been proven, since DWP did not and could not bargain the *design* specifications of the project. However, the undisputed evidence indicates that plaintiffs had the ability to bargain the design specifications of the project and actually bargained the *performance* specifications of the project. This is sufficient for satisfaction of the third *Kaiser* factor.

There can be no dispute that the parties bargained over the performance specifications. Plaintiffs' own declarants freely admit that plaintiffs prepared or negotiated the performance specifications. *E.g.,* Fletcher Dec. ¶ 3–11; Melvold Dec. ¶ 11; Herrera Dec. ¶ 13. In addition, plaintiffs admit that "*all* Specification language was negotiated. . . ." Reply at ¶ 17 (emphasis added). Furthermore, "the Contract was negotiated and prepared by . . . DWP in conjunction with ABB [and] the terms of the Contract were negotiated and agreed to by all parties prior to the bid being awarded to ABB." Reply at ¶ 10. Plaintiffs' admissions are bolstered by ABB's strong evidence of bargaining. *See* Weinrich Aff. ¶¶ 50–56, 68.

DWP urges the Court to disregard the explicit bargaining over the performance specifications and follow a California Court of Appeal decision that distinguished between design and performance specifications. *Southern Cal. Edison Co. v. Harnischfeger Corp.*, 120 Cal.App.3d 842, 175 Cal.Rptr. 67 (1981). In *Harnischfeger*, the defendant built a gantry crane for Edison for use at an Edison generating station. Nine years later a cable broke, causing extensive damage. The Court of Appeal held that Edison could state a claim for products liability. 120 Cal. App.3d at 855, 175 Cal.Rptr. 67. The Court noted that "there are factual questions as to whether [Edison] bargained for the crane's *design* specifications with respondent." *Id.* (emphasis added). Because Edison "submit-

ted only a standardized set of functional guidelines for the crane ... [and] the crane could not be designed from these specifications" the Court determined that the third *Kaiser* factor was absent. *Id.*

The *Harnischfeger* court interpreted *Kaiser* vary narrowly. The decision is not compatible with other California and Ninth Circuit decisions interpreting *Kaiser*. No other California or Ninth Circuit case has distinguished between design and performance specifications. As a policy matter, the Court believes that *Kaiser* should be interpreted liberally, not narrowly. The chief *Kaiser* considerations are the commercial setting and the bargaining for allocation of risk. Plaintiffs certainly had as great an ability to allocate risks as ABB. Unlike individual consumers facing adhesion contracts, DWP has the ability to protect itself. There is no reason to apply strict liability law rather than contract law. The Court concludes that the California Supreme Court would adopt the more liberal construction of *Kaiser* if confronted with the issue. *See generally Gentry Constr. Co. v. Superior Court*, 212 Cal. App.3d 177, 180, 260 Cal.Rptr. 421, 423 (1989) (stating broadly that commercial plaintiffs cannot recover in strict liability); *Airlift Int'l, Inc. v. McDonnell Douglas Corp.*, 685 F.2d 267, 269 (9th Cir.1982); ("[A]s a matter of law, strict liability in tort does not apply between large commercial entities who have bargained for allocation of risk."); *Scandinavian Airlines*, 601 F.2d at 428–29 (discussing risk spreading). Thus, the California Supreme Court would not follow *Harnischfeger*, and would not distinguish between design and performance specifications in the *Kaiser* setting.

■ Even assuming that there should be a distinction between design and performance specifications, in this case it would be inappropriate to distinguish between the two. In *Harnischfeger*, Edison submitted a "standardized set of functional guidelines for the crane." *Harnischfeger*, 120 Cal.App.3d at 855, 175 Cal.Rptr. 67. Here, however, the performance specifications were 1000 pages long, and were geared towards the production of a unique piece of HVDC equipment. Even though the specifications did not tell

ABB how to build the equipment, they told ABB exactly what to build. The Court holds that the plaintiffs' admitted bargaining over the performance specifications independently satisfies the third *Kaiser* factor under the facts of this case.

■ Finally, even assuming that *Kaiser* contemplates bargaining over the design specifications, DWP had the ability to bargain the design specifications had they chosen to do so. Under Ninth Circuit interpretation of California law actual bargaining over particular issues is unnecessary. Rather, in the Ninth Circuit, parties cannot recover in strict liability even where there was no bargaining at all over any of the specifications, so long as the policies behind strict liability are met.

A reading of the California and federal cases noted above indicates that bargaining the specifications of the product is not crucial to the conclusion that strict liability does not apply. As we made clear in *Scandinavian Airlines*, the primary policy implemented by strict liability is the equal distribution of risks between an individual buyer confronted with a non-negotiable contract and a commercial seller.

*S.A. Empresa De Viacao Aerea Rio Grandense v. Boeing Co.*, 641 F.2d 746, 754 (9th Cir.1981). In *S.A. Empresa*, the Ninth Circuit affirmed the district court's granting of summary judgment even though it did not find that plaintiff had bargained the specifications of the project. *Id.; see also International Knights of Wine, Inc. v. Nave Pierson Winery, Inc.*, 110 Cal.App.3d 1001, 1007 n. 1, 168 Cal.Rptr. 301, 304 n. 1 (1980) (dicta) ("[I]t should be necessary only to show that the party seeking to invoke the doctrine could have negotiated so as to remove from himself the risk of loss from defective products.").

Certainly if bargaining over the specifications in general is not necessary, it cannot be necessary to bargain over the design specifications in particular. It would be anomalous to allow a powerful corporation to claim strict products liability protection where it could have bargained the specifications of a project but simply chose not to. Indeed, were actual bargaining necessary, even if the parties

were in agreement that the contract should allocate the risk of loss, they still would have to negotiate every line of the contract so as to prevent inadvertent application of products liability law.

Due to their size, bargaining position, prior experience with HVDC systems, (all discussed above), and general technical savvy (discussed below), DWP had the ability to bargain design specifications. It is undisputed that DWP possessed competent engineering and legal resources, both within and without the department. Grewal Aff. ¶¶ 4–5. Many of the engineers were experienced with the operation of HVDC equipment, and many even had written technical papers relating to HVDC system performance, installation, operational or functional performance testing issues. Grewal Aff. ¶ 4; Weinrich Aff. ¶ 29; Melvold Dec. ¶ 25. Finally, DWP prepared the contractual specifications with the assistance of Teshmont Consultants, Inc., an experienced HVDC consulting firm. Grewal Aff. ¶ 5.

DWP takes issue with the conclusion that they had the ability to bargain the design specifications of the project. Plaintiffs have presented credible evidence that by themselves, they could not have designed an HVDC project. However, the Court believes that the fact that they could not have designed the project themselves is immaterial to the question of whether they could have bargained the specifications. DWP had the size, background, and technical expertise to potentially negotiate concerning the design specifications. The fact that they chose not to do so is irrelevant under the third *Kaiser* factor.

In short, the Court declines to extend *Harnischfeger* to the facts of this case, and finds that the third *Kaiser* factor has been satisfied.

Fourth, the parties explicitly negotiated the allocation of the risk of loss due to defects in the product. *See* Weinrich Aff. ¶¶ 62–67. Prior to the commencement of negotiations, plaintiffs created the Request for Proposal ("RFP"), which contained approximately 60 single-spaced pages of DWP's General and Special Conditions allocating risks of loss from defects between the par-

ties. Among other things, DWP demanded that all risk of loss be borne by ABB prior to commercial acceptance; that the time of commercial acceptance be determined unilaterally by DWP's engineer; that ABB bear the risk of losses caused by DWP's delays; that ABB's post-acceptance warranty obligations be secured by an irrevocable $8 million letter of credit; and that ABB obtain for DWP's benefit insurance against losses due to casualties such as fire and earthquake, until sometime after acceptance. *Id.* ¶¶ 61–67. These issues were discussed at the negotiations, and ABB ultimately agreed to almost all of them. In fact, except for a limited change to the definition of "acceptance," and the addition of a claims procedure by which ABB could seek price adjustment to the extent that ABB felt it had unfairly incurred losses attributable to DWP, the allocation of risks in the Contract was just what DWP had demanded in its RFP. *Id.* ¶¶ 41, 47, 67; Grewal Aff. ¶ 8; Herrera Dec. ¶ 31. Thus, the negotiations were resolved in DWP's favor.

DWP does not dispute that the parties negotiated regarding the risk of loss in general. Rather, they contend that the parties did not specifically discuss the risk of loss from fire. As mentioned above, *Kaiser* does not demand such specificity. DWP could have negotiated regarding the risk of loss from fire. If they chose not to or even inadvertently failed to do so, DWP will have to suffer the consequences. Thus, the Court finds that the fourth *Kaiser* factor is satisfied.

The Court further finds that discovery would not lead to a different result on the Court's application of the *Kaiser* factors. On the Friday before the Monday hearing on the original Motion for Summary Judgment, the Court received from plaintiffs a brief requesting discovery on several issues prior to the Court's ruling on the Motion. The brief is not accompanied by any declaration. For summary judgment to be forestalled, it must "appear from [plaintiffs'] affidavits" that they "cannot for reasons stated present by affidavit facts essential to justify the party's opposition." Fed.R.Civ.P. 56(f). As none of plaintiffs' affidavits make this show-

ing, plaintiffs cannot complain that they have not had adequate opportunity for discovery. *See Brae Transp., Inc. v. Coopers & Lybrand,* 790 F.2d 1439, 1443 (9th Cir.1986) ("Rule 56(f) requires affidavits setting forth the particular facts expected from ... discovery."). Furthermore, even assuming that the affidavits were satisfactory, plaintiffs have not shown that the questions they wish to ask would shed light on their arguments.[3] In fact, the issues plaintiffs wish to take discovery on are irrelevant. For example, plaintiffs would like to take discovery on the nature of design specifications. But as the Court previously noted, the third *Kaiser* factor is met even if DWP only bargained the performance specifications. In addition, plaintiffs apparently seek discovery regarding the Contract negotiations. However, even plaintiffs' declarants admit that the parties negotiated at least the performance specifications and certain elements of risk allocation. These admitted negotiations were sufficient to satisfy *Kaiser.* No discovery is necessary. Thus, the Court GRANTS summary judgment for defendant on the products liability claim (Count IV).

### 2. Economic Loss

For the reasons stated *infra,* part II.B, the Court alternatively holds that defendant is entitled to summary judgment on the products liability claim because plaintiffs' sole damages were 'economic losses.'

### B. Negligence

■■■■ ABB argues that they are entitled to summary judgment on the negligence claim due to the "economic loss" rule. Any discussion of the economic loss rule must begin with *Seely v. White Motor Co.,* 63 Cal.2d 9, 19, 45 Cal.Rptr. 17, 23, 403 P.2d 145, 151 (1965). There, the California Supreme Court held that a claim for economic

losses[4] is barred in a tort action, absent physical injury to property. *Seely* provides important background, but is not directly on point. In this case there was substantial injury to property; the allegedly defective product was destroyed in the fire. *Seely*'s reasoning is instructive, however. The essential rationale of the case was that contract and warranty law should govern the economic relations between contracting parties. To permit recovery for economic losses under tort theory would destroy any contractual allocation of risks between the parties.

Subsequent to *Seely,* various California and Federal cases have discussed the issue of whether a plaintiff can recover under a negligence theory when the only injury consists of damage to the goods sold under the contract. The California Supreme Court has not considered this exact issue, and California appellate courts have come to different conclusions. Both the Ninth Circuit and a District Court have concluded that a buyer cannot recover under a negligence theory under these circumstances. Instead, recovery is limited to the rights provided by the UCC.

> Where the suit is between a non-performing seller and an aggrieved buyer and the injury consists of damage to the goods themselves and the costs of repair of such damage or a loss of profits that the deal had been expected to yield to the buyer, it would be sensible to limit the buyer's rights to those provided by the Uniform Commercial Code.... *Whether the complaint is cast in terms of strict liability or negligence should make no difference.*

*S.M. Wilson & Co. v. Smith Int'l, Inc.,* 587 F.2d 1363, 1376 (9th Cir.1978) (emphasis added).

In *Frank M. Booth, Inc. v. Reynolds Metals Co.,* 754 F.Supp. 1441, 1449–50 (E.D.Cal. 1991), Judge Levi did an extensive analysis

---

**3.** In this regard, the Court notes that the brief is virtually incomprehensible. DWP lists 51 possible deponents and states very generally the type of issues the deponents would discuss. DWP makes absolutely no effort to link the discovery issues to the particular facts and law discussed in the parties' briefs on the Motion for Summary Judgment.

**4.** California courts define economic loss as " 'damages for inadequate value, costs of repair and replacement of the defective product or consequent loss of profits—without any claim of personal injury or damages to other property.' " *Sacramento Regional Transit Dist. v. Grumman Flxible,* 158 Cal.App.3d 289, 295, 204 Cal.Rptr. 736, 742 (1984) (quoting *Alfred N. Koplin & Co. v. Chrysler Corp.,* 49 Ill.App.3d 194, 7 Ill.Dec. 113, 364 N.E.2d 100 (1977)).

of California law on this issue. He concluded that California law "denies recovery between contracting commercial parties when the claim is based upon either strict products liability or negligence and is asserted solely for economic losses." *Id.* at 1450. Judge Levi noted that there was no privity of contract in the few California cases allowing recovery for economic losses on negligence claims. Thus, the damaged party had no remedy under the UCC. *Id.* at 1449.

The principal case allowing recovery for economic losses where the parties were not in privity is *J'Aire Corp. v. Gregory,* 24 Cal.3d 799, 157 Cal.Rptr. 407, 598 P.2d 60 (1979). In *J'Aire,* the court permitted a lessee of a building constructed negligently by a defendant to recover for economic losses. The Court held that there was a sufficiently special relationship between the parties such that plaintiff's economic losses were foreseeable. The court relied on an earlier California Supreme Court case that had used a six factor test to determine "whether in a specific case the defendant will be held liable [in negligence] to a third party not in privity." *Biakanja v. Irving,* 49 Cal.2d 647, 650, 320 P.2d 16 (1958).[5]

Only two California Court of Appeal decisions have stated that plaintiffs can recover for economic losses even if they were in privity with the defendant. Both purported to rely on the *J'Aire/Biakanja* six-factor special relationship test. In *Pisano v. American Leasing,* 146 Cal.App.3d 194, 194 Cal. Rptr. 77 (1983), a California Court of Appeal allowed an individual cabinetmaker who leased a defective sanding machine to recover on negligence claim based solely on economic losses. In another case (decided just five days before the hearing on this Motion), a Court of Appeal stated in dicta that economic losses could be recovered in an action for negligence so long as the special relationship test was met. *Ott v. Alfa–Laval Agri, Inc.,* 31 Cal.App.4th 1439, 37 Cal.Rptr.2d 790,

796 (1995). Despite *Pisano* and *Ott,* the Court concludes that under the facts of this case, plaintiffs cannot recover on their negligence claim based solely on economic losses.

*Pisano* is the only California case to allow recovery on a negligence theory for economic losses where plaintiffs and defendants were parties to a contract. The court did not explain why it diverged from both *J'Aire* and *Biakanja,* which limited recovery to situations where the parties were in privity. Later cases have questioned *Pisano*'s holding. *3250 Wilshire Boulevard v. W.R. Grace & Co.,* 1989 *Westlaw* 260222, *5–6 (C.D.Cal. July 24, 1989); *Grumman Flxible,* 158 Cal. App.3d at 299–300, 204 Cal.Rptr. at 743. This Court agrees with Judge Walker that *Pisano*'s "viability remains doubtful." *AB Avnet EMG v. Sierra Semiconductor Corp.,* 1993 *Westlaw* 280504, *4 (N.D.Cal. July 9, 1993).

The *Ott* case is slightly more problematic. In *Ott,* the plaintiffs, owners of a family dairy farm, sued the manufacturers of a milking machine for lost milk production due to injuries the machine allegedly inflicted on their cows. The plaintiffs did not purchase the milking machine directly from the defendants; indeed, "[t]he system was sold to plaintiffs by defendants' local independent distributor." *Ott,* 37 Cal.Rptr.2d at 792. At trial, the plaintiffs contended that the milking machine caused infections and irritation in their cows, and also caused the cows to become dry too soon, due to "stray voltage emanating from the milking system and shocking the cows while they were being milked." *Id.* at 793 & n. 1–3. The plaintiffs sued to recover, among other things, lost profits due to the dairy herd's lower production. *Id.* at 794–95. On the first day of trial, the judge ruled that economic losses were not a compensable element of damages in a negligence action. *Id.* at 794 n. 4. The case proceeded to trial and plaintiffs obtained a judgment for $13,542.39. *Id.* at 795. Re-

---

5. The *J'Aire* Court stated that the existence of a special relationship depends on:
   (1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct and (6) the policy of preventing future harm.
   *J'Aire,* 24 Cal.3d at 804, 157 Cal.Rptr. at 410, 598 P.2d at 63.

viewing the record, the Court of Appeal concluded that the trial court should have entered judgment for defendants on all counts, but in dicta stated that economic damages would be recoverable if certain conditions were met.

*Ott* does not bind the Court for four reasons. First, *Ott* is distinguishable because the *Kaiser* factors were not present. As the Court discussed above, ABB is entitled to summary judgment on strict liability under *Kaiser*. The *Ott* case does not even mention *Kaiser*. In fact, the *Kaiser* factors could not have been a consideration in *Ott* because the Otts bought their milking system from a local independent distributor, not directly from the manufacturer. Lacking contractual privity with the manufacturer, the Otts had no opportunity to bargain, unlike DWP in the present case.

The federal courts that have addressed this issue have concluded that where the *Kaiser* factors are present, plaintiffs should not be able to recover for economic losses regardless of whether the plaintiffs attempt to proceed under a strict liability or negligence theory. *See S.M. Wilson & Co.*, 587 F.2d at 1376; *Frank M. Booth, Inc.*, 754 F.Supp. at 1449–50. The Court believes that if the *Kaiser* factors were present in *Ott*, the *Ott* court might have come to the same conclusion as this Court. Accordingly, *Ott* does not preclude the Court from applying *Kaiser* to DWP's negligence claim.

■ Second, *Ott* was not, in fact, an economic loss case. The economic loss rule governs only when the product in question has not caused physical injury to other, non-contract property. *See, e.g., Grumman Flxible*, 158 Cal.App.3d at 294, 204 Cal.Rptr. at 739; *Frank M. Booth, Inc.*, 754 F.Supp. at 1449 n. 4. In *Ott*, plaintiffs' dairy herds allegedly suffered physical injury and lost milk production due to "stray voltage emanating from the milking system and shocking the cows...." *Ott*, 37 Cal.Rptr.2d at 793. Since this claim arose from physical damage to "other property" (i.e. the cows), the Court of Appeal correctly rejected—albeit for the wrong reasons—the trial court's economic loss holding. Thus, *Ott*'s dicta is unpersuasive.

Third, *Ott*'s privity analysis misreads applicable precedent. The *Ott* court applied the six-factor *Biakanja/J'Aire* test, which it viewed as authorizing negligence claims whenever a "special relationship" exists, even though the parties may be in privity and able to avail themselves of contract remedies. *Id.* 37 Cal.Rptr.2d at 797, 800–01. Yet, the California Supreme Court in *Biakanja* expressly held that its six-factor test was meant to determine "whether in a specific case the defendant will be held liable [in negligence] to a third party not in privity." *Biakanja*, 49 Cal.2d at 650, 320 P.2d 16. The facts in *Biakanja* illustrate the logic of the rule: the defendant notary public had acted negligently in preparing a will, and this negligence had damaged the will's beneficiaries. The beneficiaries, of course, were not in privity with the notary. Had the plaintiffs' negligence claim been precluded, plaintiffs would have been denied any remedy.

■ Similarly, *J'Aire* involved a negligence claim brought by the tenant of a commercial building against a contractor who had remodeled the building for its owner. The parties had no contractual relationship. *J'Aire*, 24 Cal.3d at 802, 805, 157 Cal.Rptr. at 409, 411. The court specifically stated that the six-factor test determined when a cause of action existed for "negligent performance of a contract although the parties were not in contractual privity." *J'Aire*, 24 Cal.3d at 804, 157 Cal.Rptr. at 410. The Court concludes that California Supreme Court cases are clear: the six-factor test should be applied only when parties are not in privity.

This conclusion is supported by policy concerns. Both the California Supreme Court and the Ninth Circuit have repeatedly cautioned against applying tort principles to contractual relationships. *See Freeman & Mills, Inc. v. Belcher Oil Co.*, 11 Cal.4th 85, 44 Cal.Rptr.2d 420, 900 P.2d 669 (Cal.1995); *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 683, 254 Cal.Rptr. 211, 227, 765 P.2d 373, 389 (1988); *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal.4th 503, 517, 28 Cal.Rptr.2d 475, 482, 869 P.2d 454, 461 (1994); *Oki America, Inc. v. Microtech Int'l, Inc.*, 872 F.2d 312, 316 (9th Cir.1989) (Kozin-

ski, J, concurring). There is simply no justification for extending potential tort liability under the six-factor test to commercial parties that have negotiated their own contractual obligations. As the California Supreme Court recently noted, "predictability about the cost of contractual relationships plays an important role in our commercial system." *Foley*, 47 Cal.3d at 683, 254 Cal.Rptr. at 227, 765 P.2d at 389 (declining to extend the special relationship test to breach of implied covenant of good faith and fair dealing in the employment context).

The six-factor test is difficult to apply, both by courts and by parties who anticipate entering into a contract and defining the economic rights of the parties at the outset of the transaction. *See generally Ott*, 37 Cal. Rptr.2d at 801–02. For example, the extent to which the transaction "was intended to affect the plaintiff" is as vague a standard as can be imagined; every transaction affects the participating parties in some way. The "closeness of the connection between the defendant's conduct and the injury suffered" would often be an issue for trial, thus preventing the parties from knowing what standard governs them until the judicial process has run its course. No clear guidelines are set forth for determining "the moral blame attached to the defendant's conduct," which seems to the Court to be a highly subjective determination. Even when some of the six factors are present, they must then be balanced. *Biakanja*, 49 Cal.2d at 650, 320 P.2d 16. Substituting such nebulous inquiries for contracts negotiated by the parties and the carefully drafted default provisions of the California Commercial Code would irreparably undermine the predictability of transactions in goods.

In this case, the Contract expressly excluded consequential damages for negligence. *See* Contract Subarticle E1–32.2.1. Thus, substituting negligence recovery for contract damages would wreak particular disruption to the parties' elaborate contractual relationships and allocation of risk. The Court declines to follow *Ott's* statement that privity is irrelevant, because this is contrary to both precedent and policy.

Fourth, the Court must use its best judgment to ascertain how the California *Supreme* Court would decide this issue. *E.g., General Motors Corp. v. Doupnik*, 1 F.3d 862, 865 (9th Cir.1993). Lower state court decisions may provide guidance, but the Court is not bound to follow such decisions. *Id.* at 865 n. 4 (citing *C.I.R. v. Estate of Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967)). *Cf. Westlands Water Dist. v. Amoco Chem. Co.*, 953 F.2d 1109, 1111 (9th Cir.1991) (quoting *State Farm Fire & Casualty Co. v. Abraio*, 874 F.2d 619, 621 (9th Cir.1989)) ("When an intermediate appellate court has ruled on an issue, and the state supreme court has not yet ruled on it, [the Ninth Circuit] will follow the intermediate court's decision 'unless there is convincing evidence that the state supreme court would decide differently.' "). The Court concludes that the California Supreme Court would not follow *Ott*. If faced with the issue, the California Supreme Court would instead follow the easily-administered, bright-line economic loss rule set forth in *East River S.S. Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986).

In *East River*, an admiralty case, the Supreme Court discussed the application of tort law where a defective product injures itself, but no other property. The Court analyzed various state and federal decisions, and eventually adopted the majority rule, based in part on the venerable *Seely* decision. The Court held that "a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself." 476 U.S. at 871, 106 S.Ct. at 2302.

Because the Supreme Court fully discussed the various policy rationales behind the majority rule, this Court will not repeat the discussion here. *See East River*, 476 U.S. at 866–75, 106 S.Ct. at 2299–2304. Since *East River*, numerous jurisdictions have adopted the majority economic loss rule. *See, e.g., Bocre Leasing Corp. v. General Motors Corp.*, 84 N.Y.2d 685, 621 N.Y.S.2d 497, 501, 645 N.E.2d 1195 (1995) (adopting majority rule as set forth in *East River* and citing numerous cases in accord).

**1190**

*See also Restatement (Third) of Torts,* Council Draft No. 2 (Sept. 2, 1994) and Prelim. Draft No. 2, cmt. d (May 19, 1994).

In sum, the Court believes that, if confronted with the issue, the California Supreme Court would agree with the United States Supreme Court, the majority of the state courts, the Ninth Circuit, and the writers of the Restatement, rather than the *Ott* decision. The California Supreme Court would most likely hold that where the four *Kaiser* criteria are met, where the parties are in privity, and where the only damages are economic losses, there can be no recovery under a negligence theory. The damaged party would be limited to its rights under the UCC.

DWP has alleged no harm other than damage to the property itself. DWP attempts to distinguish the above line of cases by noting that is has "sustained a catastrophic, total loss of property." Supplemental Memorandum of Points and Authorities in Opposition to Motion for Summary Judgment at 27. The Court sympathizes with plaintiffs' loss. Nevertheless, no matter how catastrophic the loss, it is still no more than a loss to the contract property itself. Thus, it is economic loss under California law. Because the four *Kaiser* factors have been met, and because plaintiffs allege no damages other than economic losses, the Court GRANTS summary judgment for defendant on the negligence claim (Count V).

IT IS SO ORDERED.