695 A.2d 264

SAMUEL P. ALLOWAY, III, AND NEW HAMPSHIRE INSURANCE CO., PLAINTIFFS–RESPONDENTS, v. GENERAL MARINE INDUSTRIES, L.P., DEFENDANT–APPELLANT, AND MULLICA RIVER BOAT BASIN, DEFENDANT.

Argued November 18, 1996—Decided June 30, 1997.

621

*John C. Penberthy, III,* argued the cause for appellant (*Mesirov Gelman Jaffe Cramer & Jamieson,* attorneys; *Mr. Penberthy* and *Matthew O. Dickstein,* on the brief).

*Sanford F. Schmidt* and *Edward A. Penberthy* argued the cause for respondents (*Brandt Haughey Penberthy Lewis & Hyland,* attorneys for *Samuel P. Alloway, III,* and *Mr. Schmidt,* attorney for New Hampshire Insurance Co.; *Suzanne E. Bragg,* on the brief).

The opinion of the Court was delivered by

POLLOCK, J.

The primary issue is whether New Hampshire Insurance Co. ("New Hampshire") and its insured, Samuel P. Alloway III ("Alloway") (jointly described as "plaintiffs") may recover from General

Marine Industries, Inc. ("GMI") in negligence and strict liability for economic loss caused by a defect in a power boat purchased by Alloway and insured by New Hampshire. Alloway purchased the boat from Mullica River Boat Basin ("Mullica"), a retail boat dealer, and insured it with New Hampshire under a comprehensive general insurance policy. Mullica had purchased the boat from Century Boats ("Century"), an unincorporated division of Glasstream Boats, Inc. ("Glasstream"), the manufacturer. Subsequently, Glasstream went bankrupt, and GMI, formerly known as GAC Partners, P.L. ("GAC"), purchased Glasstream's assets.

Allegedly because of a defective seam in the swimming platform, water seeped into the boat, which sank while docked. New Hampshire paid Alloway under the policy. Alloway then subrogated New Hampshire to his rights, subject to Alloway's claim for the deductible portion of his loss.

Plaintiffs instituted this action to recover for their respective economic losses. The Law Division granted GMI's motion to dismiss, holding that plaintiffs could not recover for economic loss resulting from damage to the boat itself. It held that plaintiffs' only claim was for breach-of-warranty under the Uniform Commercial Code ("U.C.C."), a claim barred by 11 U.S.C.A. § 363 ("§ 363") of the Bankruptcy Code. The Appellate Division reversed, holding that plaintiffs could recover in tort for the economic loss and that the Bankruptcy Code did not bar recovery. 288 *N.J.Super.* 479, 672 *A.*2d 1177 (1996). We granted certification, 145 *N.J.* 372, 678 *A.*2d 713 (1996). We reverse the judgment of the Appellate Division and reinstate that of the Law Division.

## I.

From the limited record, the following facts emerge. In October 1989, Glasstream filed a voluntary petition in bankruptcy. Five months later, the Bankruptcy Court directed Glasstream to sell substantially all of its assets to GMI "free and clear of any interest in such property." At some unspecified time, Glasstream made the boat and sold it to Mullica.

On July 14, 1990, Alloway purchased the boat, a new thirty-three foot Century Grande XL ("Grande") boat from Mullica. The purchase price was $61,070. Century expressly warranted for twelve months from the date of purchase that the boat was "free from defects in material and workmanship under normal use and when operated according to instructions." Alloway obtained from New Hampshire a comprehensive general insurance policy on the boat.

Three months later, while docked at the Bayview Marina in Manahawkin, New Jersey, the Grande sank. No other property was damaged, and no one sustained personal injuries.

Alloway filed a claim with New Hampshire, which spent $40,-106.63 to repair the boat. Alloway, who had a $2,500 deductible under the policy, paid $2,490 towards the repairs. After completion of the repairs, he received a trade-in credit of $38,770 for the Grande on the purchase of a new boat.

Thereafter, Alloway filed a three-count complaint against Mullica and GMI, seeking recovery for his economic loss. In count one, Alloway sought to recover for Mullica's breach of "the manufacturer's warranty" for "repair or replacement of any part found to be defective." Count two alleged a strict-liability claim asserting that Century had manufactured a defective boat for which GMI was liable as Century's successor. Count three alleged that Glasstream, "negligently manufactured and inspected the boat," that GMI was liable to Century's successor, and that Mullica had failed to discover the defect.

Alloway then assigned his claims to New Hampshire, but retained a claim for the loss in value of the boat. He sought the $2,490 he had paid towards the repair of the boat, "[t]he difference in value between the price paid for the boat and the market value of the boat in its defective condition," attorneys' fees, and costs. Thereafter, plaintiffs filed an amended complaint asserting, in addition to Alloway's original claims, New Hampshire's claim for the cost of repairs.

On October 3, 1991, GMI, as successor to Glasstream, removed the action to the United States District Court for the District of New Jersey, which referred the matter to the Bankruptcy Court. Alloway and New Hampshire filed a proof of claim as unsecured creditors. The Bankruptcy Court then remanded the matter to the Law Division.

The Law Division granted GMI's motion to dismiss for failure to state a cause of action. It relied on *Spring Motors Distribs. v. Ford Motor Co.*, 98 *N.J.* 555, 489 *A.*2d 660 (1985), which held that a purchaser could not maintain an action in strict liability for economic loss. It also relied on *D'Angelo v. Miller Yacht Sales*, 261 *N.J.Super.* 683, 619 *A.*2d 689 (1993), in which the Appellate Division held that a consumer who had purchased a yacht that was not as represented could sue the manufacturer under the U.C.C. for breach of warranty, but not in strict liability. According to the *D'Angelo* court, the U.C.C. provides a consumer with the exclusive remedy for economic loss resulting from the breach of express or implied warranties. *Id.* at 688, 619 *A.*2d 689. The Law Division reasoned that because plaintiffs sought to recover for economic loss to the boat itself, GMI was not liable as Glasstream's successor.

Because Mullica's insurer was insolvent, New Hampshire dismissed its subrogation claim against Mullica. *See N.J.S.A.* 17:30A–5, –8 (denying subrogation claims against insured of insolvent insurer). Alloway then settled his claim against Mullica, thereby extinguishing plaintiffs' claims for breach of warranty. Thus, Alloway has already received payment from New Hampshire for the cost of repairs, less the $2,500 deductible under his policy, and an undisclosed sum in settlement of his claim against Mullica.

The Appellate Division reversed, relying on *Santor v. A & M Karagheusian, Inc.*, 44 *N.J.* 52, 207 *A.*2d 305 (1965), which recognized that a consumer could maintain a strict-liability claim against a manufacturer for loss of value of a defective carpet. According to the Appellate Division, *Spring Motors* precluded a

commercial purchaser, but not a consumer, from recovering in strict liability. 288 *N.J.Super.* at 486–87, 672 *A.*2d 1177. Observing that *Spring Motors* declined to reconsider *Santor,* the Appellate Division concluded that "[s]ince *Santor* has not been overruled, we must follow it." *Id.* at 488, 672 *A.*2d 1177. In so holding, the court rejected the Appellate Division's holding in *D'Angelo, supra,* 261 *N.J.Super.* 683, 619 *A.*2d 689.

The Appellate Division also concluded that plaintiffs could recover against GMI as the successor to Glasstream. The court relied on *Ramirez v. Amsted Industries, Inc.,* 86 *N.J.* 332, 431 *A.*2d 811 (1981), which permitted a worker who was injured by a defective power press to maintain a strict-liability action against a defendant that had purchased the assets of the manufacturer of the press. According to the Appellate Division, the right to recover in strict liability against a successor owner should not depend on whether the recovery was for personal injuries or economic loss. 288 *N.J.Super.* at 490–91, 672 *A.*2d 1177. In addition, the court reasoned that the Bankruptcy Court's sale of the boat "free and clear of any interest in [the boat]" did not extend to lawsuits and, therefore, did not bar the instant action. *Id.* at 493, 672 *A.*2d 1177. Finally, the court held that a suit against GMI as the purchaser of Century's assets in the bankruptcy sale did not constitute a claim against Century. Consequently, plaintiffs' suit against GMI did not offend the Bankruptcy Code's scheme for the priority of claimants. *Ibid.* Essentially, the Appellate Division held that GMI, as the successor to Glasstream, was liable to plaintiffs in negligence and strict liability for economic loss caused by the sinking of the boat.

## II.

The threshold issue is whether plaintiffs may rely on theories of strict liability and negligence to recover damages for economic loss resulting from a defect that caused injury only to the boat itself. Plaintiffs seek damages for the cost of repair and for the boat's lost value on trade-in. They do not allege that other property was

damaged or that anyone sustained personal injuries. The question reduces to whether plaintiffs may use tort theories to recover the lost benefit of their bargain from the purchaser of the manufacturer's assets, GMI.

Preliminarily, economic loss encompasses actions for the recovery of damages for costs of repair, replacement of defective goods, inadequate value, and consequential loss of profits. *See* James J. White & Robert S. Summers, *Uniform Commercial Code* 534–44 (3d ed.1988); Note, *Economic Loss in Products Liability Jurisprudence,* 66 *Colum. L.Rev.* 917, 918 (1966). Economic loss further includes "the diminution in value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold." Comment, *Manufacturers' Liability to Remote Purchasers For 'Economic Loss' Damages—Tort or Contract?,* 114 *U.Pa.L.Rev.* 539, 541 (1966).

■ Allocation of economic loss between a manufacturer and a consumer involves assessment of tort and contract principles in the determination of claims arising out of the manufacture, distribution, and sale of defective products. Generally speaking, tort principles are better suited to resolve claims for personal injuries or damage to other property. *See Spring Motors Distribs., supra,* 98 *N.J.* at 579–80, 489 *A.*2d 660; *East River S.S. v. Transamerica Delaval,* 476 *U.S.* 858, 871–72, 106 *S.Ct.* 2295, 2302–03, 90 *L.Ed.*2d 865 (1986); *Seely v. White Motor Co.,* 63 *Cal.*2d 9, 45 *Cal.Rptr.* 17, 403 *P.*2d 145, 149–51 (1965); *Bocre Leasing Corp. v. General Motors Corp.,* 84 *N.Y.*2d 685, 621 *N.Y.S.*2d 497, 499, 645 *N.E.*2d 1195, 1197 (1995). Contract principles more readily respond to claims for economic loss caused by damage to the product itself. *See Spring Motors, supra,* 98 *N.J.* at 580, 489 *A.*2d 660; *East River, supra,* 476 *U.S.* at 871–72, 106 *S.Ct.* at 2302, 90 *L.Ed.*2d 865; *Seely, supra,* 45 *Cal.Rptr.* 17, 403 *P.*2d at 149–51; *Lewinter v. Genmar Indus.,* 26 *Cal.App.*4th 1214, 32 *Cal.Rptr.*2d 305, 309 (1994); *Florida Power & Light Co. v. Westinghouse Elec. Corp.,* 510 *So.*2d 899, 901–02 (Fla.1987); *Oceanside At Pine Point v.*

*Peachtree Doors, Inc.*, 659 *A*.2d 267, 270 (Me.1995); *Bocre Leasing, supra,* 621 *N.Y.S.*2d at 501, 645 *N.E.*2d at 1199.

■ Various considerations support the distinction. Tort principles more adequately address the creation of an unreasonable risk of harm when a person or other property sustains accidental or unexpected injury. *See Spring Motors, supra,* 98 *N.J.* at 570–71, 579–80, 489 *A*.2d 660. When, however, a product fails to fulfill a purchaser's economic expectations, contract principles, particularly as implemented by the U.C.C., provide a more appropriate analytical framework. *See East River, supra,* 476 *U.S.* at 871–75, 106 *S.Ct.* at 2302–04, 90 *L.Ed.*2d 865; *Casa Clara v. Charley Toppino & Sons,* 620 *So.*2d 1244, 1247 (Fla.1993); *Oceanside, supra,* 659 *A*.2d at 270; *Bocre Leasing, supra,* 621 *N.Y.S.*2d at 500–01, 645 *N.E.*2d at 1198–99; *Waggoner v. Town & Country Mobile Homes,* 808 *P*.2d 649, 652–53 (Okla.1990). Implicit in the distinction is the doctrine that a tort duty of care protects against the risk of accidental harm and a contractual duty preserves the satisfaction of consensual obligations. *Casa Clara, supra,* 620 *So.*2d at 1246–47; *Spring Motors, supra,* 98 *N.J.* at 579, 489 *A*.2d 660.

■ Relevant to the distinction are "the relative bargaining power of the parties and the allocation of the loss to the better risk-bearer in a modern marketing system." *Spring Motors, supra,* 98 *N.J.* at 575, 489 *A*.2d 660; *see East River, supra,* 476 *U.S.* at 871–73, 106 *S.Ct.* at 2302–03, 90 *L.Ed.*2d 865. Perfect parity is not required for a finding of substantially equal bargaining power. *Spring Motors, supra,* 98 *N.J.* at 576, 489 *A*.2d 660. Although a manufacturer may be in a better position to absorb the risk of loss from physical injury or property damage, a purchaser may be better situated to absorb the "risk of economic loss caused by the purchase of a defective product." *Ibid.; see East River, supra,* 476 *U.S.* at 871, 106 *S.Ct.* at 2302, 90 *L.Ed.*2d 865 (noting purchaser can insure against risk of economic loss); *Lucker Mfg. v. Milwaukee Steel Foundry,* 777 *F.Supp.* 413, 416–17 (E.D.Pa.

1991) (same); *Bocre Leasing, supra,* 621 *N.Y.S.*2d at 498, 645 *N.E.*2d at 1196 (same).

In the present case, nothing indicates that Alloway was at a disadvantage when bargaining for the purchase of the boat. Moreover, a thirty-three foot luxury boat with a swimming platform is not a necessity. Additionally, Alloway prudently protected himself against the risk of loss by obtaining an insurance policy that distributed that risk to his insurer, New Hampshire. To this extent, the question becomes whether GMI, which acquired the assets of the bankrupt manufacturer, or New Hampshire, which is in the business of insuring against the risk of harm caused by defective products, can better bear the risk of loss from damage to the boat. *See generally East River, supra,* 476 *U.S.* at 871–72, 106 *S.Ct.* at 2302, 90 *L.Ed.*2d 865; *Bocre Leasing, supra,* 621 *N.Y.S.*2d at 498, 500–01, 645 *N.E.*2d at 1196, 1198–99.

■ Also involved is an appreciation of the relative roles of the legislative and judicial branches in defining rights and duties in commercial transactions. Absent legislation, courts possess greater latitude in determining those rights and duties. Once the Legislature acts, respect for it as a co-equal branch of government requires courts to consider the legislation in determining the limits of judicial action. *See Spring Motors, supra,* 98 *N.J.* at 577, 489 *A.*2d 660; *see also Danforth v. Acorn Structures, Inc.,* 608 *A.*2d 1194, 1200–01 (Del.1992) (declining to displace provisions of U.C.C. with tort actions). By enacting the U.C.C., the Legislature adopted a comprehensive system for compensating consumers for economic loss arising from the purchase of defective products. *See Spring Motors, supra,* 98 *N.J.* at 577, 489 *A.*2d 660; *Danforth, supra,* 608 *A.*2d at 1194, 1200–01; *Waggoner, supra,* 808 *P.*2d at 653. The U.C.C. represents the Legislature's attempt to strike the proper balance in the allocation of the risk of loss between manufacturers and purchasers for economic loss arising from injury to a defective product. *See generally* James J. White & Robert S. Summers, 1 *Uniform Commercial Code* 582 (4th ed.1995); *East River, supra,* 476 *U.S.* at 872–73, 106 *S.Ct.* at 2302–

04, 90 *L.Ed.*2d 865; *Seely, supra,* 45 *Cal.Rptr.* at 20, 403 *P.*2d at 148; *Spring Motors, supra,* 98 *N.J.* at 577, 489 *A.*2d 660; *Bocre Leasing, supra,* 621 *N.Y.S.*2d at 498, 645 *N.E.*2d at 1196.

Consequently, the U.C.C. provides for express warranties regarding the quality of goods, *N.J.S.A.* 12A:2–313, as well as an implied warranty of merchantability, *N.J.S.A.* 12A:2–314, and an implied warranty of fitness for a particular purpose, *N.J.S.A.* 12A:2–315. When a seller delivers goods that are not as warranted, the buyer may recover the difference between the value of the defective goods and their value if they had been as warranted. Furthermore, a provision in a merchant's form is not binding on a consumer unless the consumer has signed the form. *N.J.S.A.* 12A:2–209(2). A consumer, moreover, may recover incidental and consequential damages. *N.J.S.A.* 12A:2–715(1), (2); *N.J.S.A.* 12A:2–714. In addition, the Legislature has directed courts to construe the U.C.C. liberally and to promote the U.C.C.'s underlying purposes and policies. *N.J.S.A.* 12A:1–102(1).

As a counterbalance, the U.C.C. allows manufacturers to limit their liability through disclaimers, except for personal injuries. *N.J.S.A.* 12A:2–316. Further, the U.C.C. allows parties to modify or limit damages by agreement. *N.J.S.A.* 12A:2–719. Finally, the U.C.C. provides a four-year statute of limitations to institute an action under its provisions. *N.J.S.A.* 12A:2–725. This comprehensive scheme offers significant protection to consumers while insuring that merchants are not saddled with substantial and uncertain liability. *See East River, supra,* 476 *U.S.* at 874, 106 *S.Ct.* at 2303–04, 90 *L.Ed.*2d 865.

Over thirty years ago, before the U.C.C. took effect, this Court ruled that strict liability in tort provided more suitable relief than an action for breach of an implied warranty of merchantability. *Santor, supra,* 44 *N.J.* at 53, 207 *A.*2d 305. The Court reached this unprecedented result notwithstanding that an action for breach of implied warranty, like one in strict liability, did not require privity between the purchaser and the manufacturer. *See id.* at 60–63, 207 *A.*2d 305.

Disagreement with *Santor* was not long in coming. In *Seely, supra,* 63 *Cal.2d* 9, 45 *Cal.Rptr.* 17, 403 *P.2d* 145, which was decided four months after *Santor,* the purchaser of a defective truck sued for damage to the truck and lost profits from his inability to use it in his heavy-duty hauling business. Writing for the California Supreme Court, Chief Justice Roger Traynor recognized the purchaser's claim for breach of an express warranty, but rejected his claim in strict liability. In reaching that result, Chief Justice Traynor reasoned that absent personal injury or property damage, strict liability in tort was not designed "to undermine the warranty provisions of the ... Uniform Commercial Code but, rather, to govern the distinct problem of physical injuries." *Id.,* 45 *Cal.Rptr.* at 21, 403 *P.2d* at 149.

Twenty years later, we addressed "the rights of a commercial buyer to recover for economic loss caused by the purchase of defective goods." *Spring Motors, supra,* 98 *N.J.* at 560, 489 *A.2d* 660. In that case, Spring Motors Distributors ("Spring Motors"), a commercial lessor of vehicles, bought a fleet of trucks from Ford Motor Co. ("Ford"). *Id.* at 562, 489 *A.2d* 660. Pursuant to the sales, Ford issued an express warranty on transmissions manufactured by Clark Equipment Co. ("Clark"), which had issued express warranties to Ford. Spring Motors' lessee experienced difficulties with the transmissions. *Id.* at 563, 489 *A.2d* 660. Consequently, Spring Motors suffered economic losses, which included costs of repair, lost profits, and a decrease in the market value of the trucks. *Id.* at 564, 489 *A.2d* 660. Thereafter, Spring Motors sued Ford under theories of negligence, strict liability and breach of warranty. *Ibid.* The basic issue was whether the applicable statute of limitations was the four-year statute in the U.C.C., *N.J.S.A.* 12A:2–725, or the six-year statute of limitations pertaining to tort actions for property damage, *N.J.S.A.* 2A:14–1. We held that Spring Motors had a cause of action against both Ford and Clark for breach of warranty and that the U.C.C.'s four-year period of limitations determined the time for the commencement of the action.

When the harm suffered is to the product itself, unaccompanied by personal injury or property damage, we concluded that principles of contract, rather than of tort law, were better suited to resolve the purchaser's claim. *Id.* at 580, 489 *A.*2d 660. Consequently, we held that the U.C.C. provided the appropriate period of limitations. *Id.* at 561, 489 *A.*2d 660. Because the action was between commercial parties, we did not address the issue raised by *Santor,* whether a consumer could maintain an action for both breach of warranty and strict liability. *See id.* at 575, 489 *A.*2d 660.

One year after we decided *Spring Motors,* the United States Supreme Court reviewed the roles of tort and contract law in a case involving economic loss caused by the defective design and manufacture of turbines in supertankers. *See East River, supra,* 476 *U.S.* 858, 106 *S.Ct.* 2295, 90 *L.Ed.*2d 865. In a unanimous opinion, the Court began, "[i]n this admiralty case, we must decide whether a cause of action in tort is stated when a defective product purchased in a commercial transaction malfunctions, injuring only the product itself and causing purely economic loss." *Id.* at 859, 106 *S.Ct.* at 2296, 90 *L.Ed.*2d 865. The Court continued, "charting a course between products liability and contract law, we must determine whether injury to a product itself is the kind of harm that should be protected by products liability or left entirely to the law of contracts." *Ibid.*

After analyzing relevant state court decisions, including *Santor, Seely,* and *Spring Motors,* the Court concluded "that a manufacturer in a commercial transaction has no duty under negligence or strict products-liability theory to prevent a product from injuring itself." *Id.* at 871, 106 *S.Ct.* at 2302, 90 *L.Ed.*2d 865. In an action for economic loss, the reasons for imposing a tort duty are weak while "those for leaving the party to its contractual remedies are strong." *Ibid.* For example, injury to a product itself neither implicates the safety concerns of tort law, *ibid.,* nor justifies "[t]he increased cost to the public that would result from holding the manufacturer liable in tort." *Id.* at 872, 106 *S.Ct.* at 2302, 90 *L.Ed.*2d 865. Allowing recovery for all foreseeable damages in claims seeking purely economic loss, could subject a manufacturer to liability for vast sums arising from the expectations of parties

downstream in the chain of distribution. *Id.* at 874, 106 *S.Ct.* at 2304, 90 *L.Ed.*2d 865.

Subsequently, state and federal courts, when exercising admiralty jurisdiction, have recognized that *East River*'s bar of strict-liability claims extends to actions brought by consumers. *See, e.g., Karshan v. Mattituck Inlet Marina & Shipyard,* 785 *F.Supp.* 363, 365–66 (E.D.N.Y.1992) (finding purchaser of pleasure boat barred from recovering economic loss in tort because *East River* was not limited to commercial buyers); *Stanton v. Bayliner Marine Corp.,* 123 *Wash.*2d 64, 866 *P.*2d 15, 23–24 (1993) (holding that matter involving consumer purchaser of allegedly defective pleasure boat was governed by maritime-product-liability rule, which denies recovery for economic loss, because weight of authority interpreting maritime rule has not made distinction between commercial and consumer transactions), *cert. denied,* 513 *U.S.* 819, 115 *S.Ct.* 78, 130 *L.Ed.*2d 32 (1994); *see also Lewinter, supra,* 32 *Cal. Rptr.*2d at 308–10 (affirming grant of summary judgment because admiralty jurisdiction applied to consumer purchaser of yacht who brought tort action seeking compensation for economic loss resulting from catastrophic hull failure); *but see Sherman v. Johnson & Towers Baltimore, Inc.,* 760 *F.Supp.* 499, 501–02 (D.Md.1990) (holding that *East River* did not apply to relationship between commercial party and consumer).

The vast majority of courts across the country likewise have concluded that purchasers of personal property, whether commercial entities or consumers, should be limited to recovery under contract principles. *See, e.g., Arkwright–Boston Mfgs. Mutual Ins. Co. v. Westinghouse Elec. Corp.,* 844 *F.*2d 1174, 1178 (5th Cir.1988) (holding that Texas law did not permit recovery of economic loss resulting from damage to product itself); *Aloe Coal Co. v. Clark Equip. Co.,* 816 *F.*2d 110, 118 (3d Cir.1987) (holding that, under Pennsylvania law, fire damage to product itself was

not recoverable from manufacturer on theory of negligence, but buyer's remedies limited to law of warranty); *Purvis v. Consolidated Energy Prods. Co.*, 674 *F.*2d 217, 222–23 (4th Cir.1982) (finding that losses resulting from ineffective equipment were recoverable under law of contracts and not strict liability); *East Mississippi Power Assoc. v. Porcelain Prods. Co.*, 729 *F.Supp.* 512, 517–19 (S.D.Miss.1990) (holding that Mississippi law does not allow electric company to recover economic loss from manufacturer of defective insulation); *Public Serv. Co. v. Westinghouse Elec. Corp.*, 685 *F.Supp.* 1281, 1285 (D.N.H.1988) (holding that, under New Hampshire law, manufacturer of steam turbine electric generator could not be held strictly liable when allegedly defective product injured only itself); *Lucker Mfg., supra,* 777 *F.Supp.* at 415–17 (holding that, under Pennsylvania law, purchaser of defective steel components could not use tort theories to recover damages for purchase price, higher costs of completing project, and loss of goodwill, because these were in the nature of economic loss); *Wellcraft Marine v. Zarzour,* 577 *So.*2d 414, 418 (Ala.1991) (finding that purchaser of defective motor boat could not recover under state products liability statute because damage was only to boat); *Florida Power & Light Co., supra,* 510 *So.*2d at 902 (holding that buyer's claims for economic loss resulting from negligent design and manufacture of steam turbines were cognizable in contract but not tort); *Bay State–Spray & Provincetown S.S. v. Caterpillar Tractor Co.,* 404 *Mass.* 103, 533 *N.E.*2d 1350, 1351–53 (1989) (finding that action for lost profits and costs of repair concerning defective steamship engines was governed by U.C.C. statute of limitations rather than products liability limitations period); *Bocre Leasing, supra,* 621 *N.Y.S.*2d 497, 645 *N.E.*2d at 1199–1200 (holding that commercial purchaser of used helicopter, which crashed and caused injury only to itself, could not recover in negligence or strict tort liability for economic loss); *Cooperative Power Ass'n v. Westinghouse Elec. Corp.,* 493 *N.W.*2d 661, 665–66 (N.D.1992) (holding that manufacturer of machine sold in commercial transaction not liable in negligence or strict tort liability for economic loss when machine injures only itself); *Mid*

*Continent Aircraft Corp. v. Curry County Spraying Serv., Inc.,* 572 *S.W.*2d 308, 312–13 (Tex.1978) (holding that parties were relegated to contractual remedies because damage to airplane was in nature of economic loss); *see also National Union Fire Ins. Co. v. Pratt & Whitney Canada, Inc.,* 107 *Nev.* 535, 815 *P.*2d 601, 603–05 (1991) (holding that economic loss not recoverable from engine manufacturer under tort theories of negligence and strict liability even though defective engine damaged entire aircraft and product caused calamitous crash).

Only a handful of jurisdictions have followed *Santor. See* White & Summers, *supra,* § 10–5 at 580 (criticizing *Santor* and stating "courts seem to have grown more willing in the last decade to label loss as economic, thus not recoverable in tort than before"); *see, e.g., Sharon Steel Corp. v. Lakeshore, Inc.,* 753 *F.*2d 851, 855–56 (10th Cir.1985) (allowing plaintiff to recover damages for economic loss under New Mexico law when plaintiff was subjected to unreasonable risk of injury); *Cova v. Harley Davidson Motor Co.,* 26 *Mich.App.* 602, 182 *N.W.*2d 800, 804 (1970) (allowing owners of golf course to recover against manufacturer in strict liability for economic losses resulting from defect in golf carts); *City of La Crosse v. Schubert, Schroeder & Assoc.,* 72 *Wis.*2d 38, 240 *N.W.*2d 124, 127 (1976) (holding that manufacturer of defective roofing materials may be liable for loss of value of roof under strict liability in tort); *see also Lloyd F. Smith Co. v. Den–Tal–Ez, Inc.,* 491 *N.W.*2d 11, 17 (Minn.1992) (holding that although U.C.C. provides the exclusive remedy in commercial transactions, consumer could still maintain tort actions for economic loss); *Livingston Bd. of Educ. v. United States Gypsum Co.,* 249 *N.J.Super.* 498, 504, 592 *A.*2d 653 (App.Div.1991) (holding that school board could bring strict-liability action for costs of asbestos removal because board was not a commercial purchaser and asbestos created grave personal safety risk).

Scholars likewise have criticized the extension of strict liability to include claims for purely economic loss. *See, e.g.,* White & Summers, *supra,* § 10–5; O'Donnell, Weiss & Kaplan, *On Differ-*

*ences Between Blood and Red Ink: A Second Look At The Policy Arguments For The Abrogation Of The Economic Loss Rule In Consumer Litigation,* 19 *Nova L.Rev.* 923, 926 (1995) (urging courts to prohibit strict-liability actions for pure economic injury, even when the potential plaintiff is not a commercial entity); Franklin, *When Worlds Collide: Liability Theories and Disclaimers in Defective Product Cases,* 18 *Stan.L.Rev.* 974, 989–90 (1966) (criticizing courts as unaware of relevance of sales law to products-liability law); Feinman, *Doctrinal Classification and Economic Negligence,* 33 *SAN DIEGO L.Rev.* 137, 150 (1996) (stating that great majority of jurisdictions follow *Spring Motors* when commercial purchaser involved); Wade, *Tort Liability For Products Causing Physical Injury and Article 2 of the U.C.C.,* 48 *Mo. L.Rev.* 1, 26 n. 87 (1983) (noting that substantial majority rule is that economic loss is not actionable in tort); Speidel, *Products Liability, Economic Loss and the U.C.C.,* 40 *Tenn.L.Rev.* 309, 316–18, 327 (1973) (pointing out that justification for imposing strict liability is less compelling where only commercial loss is suffered); *Manufacturers' Liability* note, *supra,* 114 *U.Pa.L.Rev.* at 548–49 (finding that U.C.C. remedies seem more appropriate than products liability law when damage is loss of benefit of bargain).

Following the majority rule, the American Law Institute's proposed *Restatement (Third) of Torts: Products Liability* § 21 (Proposed Final Draft April 1, 1997), defines "economic loss" to exclude recovery under tort theories for damage to a product itself. Section 21, comment d, states that "[w]hen a product defect results in harm to the product itself, the law governing commercial transactions sets forth a comprehensive scheme governing the rights of the buyer and seller." *Id.* at comment d. According to the Restatement, "*Santor* . . . appears today to stand alone in allowing a products liability action when a product did not create an unreasonable risk of harm but merely caused economic loss when it failed to meet performance expectations." *Id.* at Reporters' Note to Comment d.

Recently, several state courts have confined consumers to contract principles in actions for economic loss. In a case that involved a pleasure boat with a defective hull, the Alabama Supreme Court declined to recognize a tort action against the manufacturer when the boat took on water after striking a submerged object. *Wellcraft Marine, supra*, 577 *So*.2d 414. The purchaser sued the manufacturer and others for breach of implied warranties and under the Alabama Extended Manufacturer's Liability Doctrine. In rejecting the latter claim, the Court said that the Doctrine did not apply when the damage was to the product itself. *Id.* at 418. Declining to distinguish between purchasers who were consumers or commercial buyers, the Court held that the "rule remains the same, regardless of the nature of the consumer." *Ibid.; see also Dairyland Ins. Co. v. General Motors Corp.*, 549 *So*.2d 44, 46 (Ala.1989) (holding that consumer purchaser of defective van could not recover economic loss).

In *Casa Clara, supra*, 620 *So*.2d 1244, the Florida Supreme Court rejected the contention of homeowners that they should be allowed to recover in tort for economic loss. Consequently, the Court held that the homeowners could not maintain a tort action to recover the costs of repair and lost value in their homes. *Id.* at 1247. The Court found that statutory remedies sufficed and that contract principles more appropriately addressed their claims for disappointed expectations. *Ibid.; see Florida Power & Light Co., supra*, 510 *So*.2d at 902 (holding that commercial purchaser suffering economic loss was limited to contract remedies). Unlike with personal injuries, the "consuming public as a whole" should not "bear the cost of economic losses sustained by those who failed to bargain for adequate contract remedies." *Casa Clara, supra*, 620 *So*.2d at 1247.

Likewise, in *Danforth, supra*, 608 *A*.2d 1194, the Delaware Supreme Court rejected the contention of homeowners that an individual consumer's unequal bargaining power warranted an exception to the economic loss rule. Accordingly, the Court upheld the dismissal of the homeowners' negligence claim. *Id.* at

1201. Writing for a unanimous court, Chief Justice Veasey reasoned that to allow an exception for individual consumers would defeat the legislative intent in enacting the U.C.C. "as the complete framework of the rights and remedies available to parties to a sale of goods contract." *Id.* at 1200–01.

Other jurisdictions also have rejected homeowners' reliance on tort law to recover economic loss arising out of construction defects. *See, e.g., Oceanside, supra,* 659 *A.*2d at 270 (rejecting association's and individual homeowners' tort claims that sought recovery of economic loss caused by water damage around windows); *Morris v. Osmose Wood Preserving,* 99 *Md.App.* 646, 639 *A.*2d 147, 152 (1994) (rejecting homeowners' tort claims against plywood manufacturer for gradual deterioration of plywood in roofs because such damage constituted economic loss), *modified,* 340 *Md.* 519, 667 *A.*2d 624 (1995); *Lempke v. Dagenais,* 130 *N.H.* 782, 547 *A.*2d 290, 291 (1988) (rejecting property owners' tort claims for economic loss resulting from defective construction of garage); *Waggoner, supra,* 808 *P.*2d at 650, 653 (rejecting mobile home purchasers' tort actions against manufacturer for costs of repair and lost value resulting from defective roof design when damage was to only the mobile home itself, and holding that claim would be more properly made in warranty action). *Cf. Aronsohn v. Mandara,* 98 *N.J.* 92, 107, 484 *A.*2d 675 (1984) (declining "to decide the validity of plaintiff's negligence claim, since ... the contractor's negligence would constitute a breach of the contractor's implied promise to construct the patio in a workmanlike manner").

An unresolved issue is whether the U.C.C. or tort law should apply when a defective product poses a serious risk to other property or persons, but has caused only economic loss to the product itself. In the present case, plaintiffs have not alleged that the defective seam in the boat posed such a risk. Hence, we do not resolve the issue.

In *East River,* the United States Supreme Court rejected cases that adopted intermediate positions, which attempted "to differen-

tiate between 'the disappointed users ... and the endangered ones'... and permit only the latter to sue in tort." 476 *U.S.* at 869–70, 106 *S.Ct.* at 2301, 90 *L.Ed.*2d 865 (quoting *Russell v. Ford Motor Co.*, 281 *Or.* 587, 575 *P.*2d 1383, 1387 (1978)). The Court stated:

> [T]he intermediate positions, which essentially turn on the degree of risk, are too indeterminate to enable manufacturers easily to structure their business behavior. Nor do we find persuasive a distinction that rests on the manner in which the product is injured. We realize that the damage may be qualitative, occurring through gradual deterioration or internal breakage. Or it may be calamitous. But either way, since by definition no person or other property is damaged, the resulting loss is purely economic. Even when the harm to the product itself occurs through an abrupt, accident-like event, the resulting loss due to repair costs, decreased value, and lost profits is essentially the failure of the purchaser to receive the benefit of its bargain—traditionally the core concern of contract law.
>
> [*Id.* at 871, 106 *S.Ct.* at 2301–02, 90 *L. Ed.*2d 865 (citations omitted).]

The *Restatement* implicitly adopts *East River*, but states "[a] plausible argument can be made that products that are dangerous in these respects [i.e. discovery of the defect prevented harm from occurring or the only harm was to the product itself, but not to persons or other property] rather than merely ineffectual, should be governed by the rules governing products liability law." *Restatement, supra*, at § 21, comment d.

As previously indicated, in this case we do not resolve the issue whether tort or contract law applies to a product that poses a risk of causing personal injuries or property damage but has caused only economic loss to the product itself. *See Spring Motors, supra*, 98 *N.J.* at 578, 489 *A.*2d 660 (distinguishing "cases involving claims for actual or potential personal injuries"). Similarly, we do not reach the issue of the preclusion of a strict-liability claim when the parties are of unequal bargaining power, the product is a necessity, no alternative source for the product is readily available, and the purchaser cannot reasonably insure against consequential damages.

■ In addition to the right to recover under the U.C.C., victims of fraud or unconscionable conduct possess substantial rights to recover for common-law fraud or for violations of various

state and federal statutes. The U.C.C. expressly provides that "[u]nless displaced by the particular provisions of this Act, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy or other validating or invalidating cause shall supplement its provisions." *See N.J.S.A.* 12A:1–103. The New Jersey Products Liability Law (the "Law") is to the same effect. *N.J.S.A.* 2A:58C–1 to –11. Although the Law excludes physical damage to the product itself from the definition of "harm," *N.J.S.A.* 2A:58C–1b(2), the Legislature did not intend to codify in the Law all common-law remedies, *see Senate Judiciary Committee Statement,* Senate, No. 2805, *L.* 1987, *c.* 197. Consequently, the exclusion of physical damage from harm that falls within the Law is not dispositive.

Additionally, the Legislature has adopted the Consumer Fraud Act, which provides generous protection to defrauded consumers. *N.J.S.A.* 56:8–1 to –20; *see, e.g., Perth Amboy Iron Works v. American Home Assurance Co.,* 226 *N.J.Super.* 200, 226–27, 543 *A.*2d 1020 (App.Div.1988) (holding that commercial buyer of yacht could maintain Consumer Fraud Act and common-law fraud claims based on economic loss), *aff'd o.b.* 118 *N.J.* 249, 571 *A.*2d 294 (1990), *Coastal Group v. Dryvit Sys.,* 274 *N.J.Super.* 171, 177–79, 643 *A.*2d 649 (App.Div.1994) (finding commercial party could bring Consumer Fraud Act claims).

In 1971, the New Jersey Legislature amended the Consumer Fraud Act to authorize a private cause of action by an injured party for a violation of the Act. *L.* 1971, *c.* 247 § 7, *codified at N.J.S.A.* 56:8–19. Included in the conduct prohibited by the Consumer Fraud Act is:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise. . . .
>
> [*N.J.S.A.* 56:8–2.]

Another statute, the Truth–In–Consumer Contract, Warranty and Notice Act (the "Act"), *N.J.S.A.* 56:12–1 to –18, protects consumers by requiring that consumer contracts be clearly written and understandable. For example, if a seller violates the Act and "the violation caused the consumer to be substantially confused about the rights, obligations or remedies of the contract," the seller is liable to the consumer for actual damages, punitive damages up to $50, and reasonable attorney fees not to exceed $2,500. *N.J.S.A.* 56:12–3. A court, moreover, may reform a consumer contract if a notice provision of the contract violates the Act and the violation substantially confused and caused financial detriment to the consumer. *N.J.S.A.* 56:12–4.1. The Act further prohibits limitations on warranties that "violate[ ] any clearly established legal right of the consumer or responsibility of a seller." *N.J.S.A.* 56:12–15. An aggrieved consumer may seek a civil penalty of not less than $100, actual damages, or both, together with attorneys fees and court costs. *N.J.S.A.* 56:12–17.

Congress has provided further protection for consumers. For example, the Magnuson–Moss Warranty Act authorizes a suit for damages for breach of implied warranties, including "an implied warranty arising under state law ... in connection with the sale by a supplier of a consumer product." 15 *U.S.C.A.* § 2301(7). Thus, it offers consumers a basis in federal law for recovering damages. 15 *U.S.C.A.* § 2301(d). A consumer may bring an action against a "supplier, warrantor, or service contractor" on any "written guarantee, implied warranty or service contract." Dreier, Goldman & Katz, *New Jersey Products Liability & Toxic Torts Law* 689 (1996 ed.). This Act also limits the types of disclaimers that sellers and others may place on warranties. 15 *U.S.C.A.* § 2308.

In sum, judicial decisions and statutory enactments, including the U.C.C., protect consumers from overreaching. Against this background, a tort cause of action for economic loss duplicating the one provided by the U.C.C. is superfluous and counterproductive.

### III.

 Here, plaintiffs seek the lost value on trade-in and the costs of repairing the boat under theories of negligence and strict liability. Thus, this action raises the question whether a consumer and his insurer can maintain an action in tort for economic loss only.

Alloway insured against the risk that gave rise to his economic loss. In a sense, the question becomes whether the better risk bearer is his insurer, New Hampshire, or GMI, the purchaser of the assets of the bankrupt boat manufacturer. To impose liability on GMI is to impose on it, in addition to the price it paid for Glasstream's assets in the bankruptcy proceeding, the added cost of the loss of a boat that it never owned. The imposition of that cost would dislocate the allocation of responsibility in the U.C.C. and impose the cost of an uncertain liability on one that did not agree to assume that cost. Alloway, on the other hand, relied not on any warranty or other contractual undertaking from GMI, but on the warranties issued by the boat dealer, Mullica, and the New Hampshire policy. Under both the warranties and the insurance policy, Alloway has been reimbursed.

 By providing for express and implied warranties, that U.C.C. amply protects all buyers—commercial purchasers and consumers alike—from economic loss arising out of the purchase of a defective product. In addition, many buyers insure against the risk of the purchase of defective goods either directly through the purchase of an insurance policy, such as Alloway's purchase of the New Hampshire policy, or through insurance provided indirectly through many credit card purchases. Under the U.C.C. as construed by this Court, moreover, the absence of privity no longer bars a buyer from reaching through the chain of distribution to the manufacturer. *See Spring Motors, supra,* 98 *N.J.* at

582, 586–87, 489 *A.*2d 660; *Santor, supra,* 44 *N.J.* at 63, 207 *A.*2d 305. In addition, the United States Supreme Court, the over-whelming majority of state courts, and legal scholars have recog-nized the unfairness of imposing on a seller tort liability for economic loss. Accordingly, we hold that plaintiffs' tort claims are barred.

Before this Court, GMI argues primarily, as it has in the lower courts, that it is not liable to plaintiffs in tort. Alternatively, GMI argues for the first time that admiralty law, not state law, should determine this case. In view of our finding that GMI is not liable in tort for plaintiffs' economic loss under New Jersey law, we need not reach GMI's belated argument. *Cf. Nieder v. Royal Indem. Ins. Co.,* 62 *N.J.* 229, 234, 300 *A.*2d 142 (1973) (finding that "[i]t is a well-settled principle that our Appellate Courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available" unless the matter involves the trial court's jurisdiction or is of public importance); *see also Maisonet v. Department of Human Services, Div. of Family Dev.,* 140 *N.J.* 214, 222–23, 657 *A.*2d 1209 (1995) (holding that courts not required by Supremacy Clause to exercise original jurisdiction over civil-rights claim when asserted for first time on appeal); *R.* 2:10–5 (indicating that exercise of original jurisdiction is discretionary). Similarly, we need not reach the additional issues concerning GMI's liability as Glas-stream's successor or the effect on GMI of the purchase in bankruptcy of Glasstream's assets free and clear of all claims.

The judgment of the Appellate Division is reversed, and the judgment of the Law Division dismissing the complaint is reinstat-ed.

HANDLER, J., concurring.

In this case, the Court holds that a consumer, who has pur-chased a product, cannot rely on a common-law cause of action sounding in strict-products liability and negligence to recover damages solely for the economic loss resulting from a defect that

destroys the worth of the product. Instead, the majority determines that the consumer's exclusive remedy consists of the express warranties contained in the Uniform Commercial Code ("U.C.C."). I am not troubled with that disposition because I am convinced that in a case such as this, the consumer is not at a genuine commercial disadvantage and is the kind of consumer who falls within the ambit of the U.C.C. The consumer here is a purchaser of an expensive luxury boat whose bargaining power is substantially equivalent to that of the seller. Furthermore, because the majority has not foreclosed tort recovery for purely economic loss in instances where the parties may be economic captives with unequal bargaining power, I am able to join in the result. *See Ante* at 638–639, 695 *A.*2d at 272–273 ("[W]e do not reach the issue of the preclusion of a strict-liability claim when the parties of unequal bargaining power, the product is a necessity, no alternative source for the product is readily available, and the purchaser cannot reasonably insure against consequential damages.").

In *Spring Motors Distributors v. Ford Motor Co.*, 98 *N.J.* 555, 596–97, 489 *A.*2d 660 (1985) (Handler, J., concurring), I expressed the view that the U.C.C. did not foreclose a tort remedy for economic loss incurred by a non-commercial consumer. That category of consumer, as I viewed it, encompassed a class of purchasers who frequently would not have equal bargaining power. I believed that comparative bargaining power was the most critical factor in determining whether the U.C.C. was the exclusive remedy and that the U.C.C. did not bar other avenues of relief to consumers with substantial bargaining disadvantages. Under the U.C.C., recovery is restricted to limited claimants who meet the stringent requirements of the U.C.C. warranty provisions. Moreover, warranty disclaimers often bar recovery altogether.[1] Such a

---

[1] The majority is satisfied with the limited U.C.C. remedy because "[a]lthough a manufacturer may be in a better position to absorb the risk of loss from physical injury or property damage, a purchaser may be better situated to absorb the 'risk of economic loss caused by the purchase of a defective product.'" *Ante*

result is acceptable only where the parties to the contract have equivalent bargaining power and meaningful alternatives. *See Williams v. Walker–Thomas Furniture Co.*, 350 *F*.2d 445, 449 (D.C.Cir.1965) ("[W]hen a party of little bargaining power, and hence little real choice, signs a commercially unreasonable contract with little or no knowledge of its terms, it is hardly likely that his consent ... was ever given to all the terms.")

Comparative bargaining power cannot be determined merely by labeling a consumer either "commercial" or "non-commercial." As the facts of this case reveal, some non-commercial purchasers will enjoy equal bargaining power. Similarly, some commercial purchasers in no sense enjoy equal bargaining power or the opportunity to secure adequate protections in the bargaining process. *See Spring Motors, supra*, 98 *N.J.* at 592, 489 *A*.2d 660 (Handler, J., concurring) ("It would not be correct to consider the U.C.C. remedy to be exclusively applicable to a purchaser's claim simply because the transaction can be viewed as 'commercial' ... or because the ultimate purchaser is in business.... [T]he ultimate purchaser of a vehicle could be a travelling salesperson or a small-scale trucker, or a carpenter, plumber, electrician, or landscape gardener.") Whether the U.C.C. should be the exclusive remedy for economic loss in a particular case can be determined only by consideration of all the circumstances surrounding the transaction. In many cases, a gross inequality of bargaining power will supplant the exclusivity of the U.C.C. remedy.

In sum, I am confident that the Court's decision does not preclude tort remedies for economic loss in such circumstances. I thus concur in its judgment.

Justice STEIN joins in this opinion.

---

at 628, 695 *A*.2d at 268 (citations omitted). That is not always the case. One can imagine myriad instances where the purchaser of an expensive necessity, such as a refrigerator or an oven, could be devastated by the product's defectiveness.

HANDLER and STEIN, JJ., concur in result.

*For reversal and reinstatement*—Chief Justice PORITZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*For affirmance*—None.